1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF SOUTH DAKOTA

3                        SOUTHERN DIVISION

4    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
                                        Civ. 11-4121
5
     ARGUS LEADER MEDIA,
6    dba ARGUS LEADER,

7                        Plaintiff,

8        -vs-                           CLOSING STATEMENTS

9

10   UNITED STATES DEPARTMENT
     OF AGRICULTURE,

11                       Defendant.

12

13                               U.S. District Courthouse
14                               Sioux Falls, SD
                                 May 25, 2016
15   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

16                        COURT TRIAL
               TRANSCRIPT OF CLOSING STATEMENTS
17
     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
18   BEFORE:   The Honorable Karen E. Schreier
               U.S. District Court Judge
19             Sioux Falls, SD

20

21   APPEARANCES:

22   Mr. Jon E. Arneson
     Attorney at Law
23   123 S. Main Ave.  Suite 202
     Sioux Falls, SD 57104
24                       for the Plaintiff

25

```
 1     APPEARANCES:  (Continued)

 2

 3     Ms. Stephanie C. Bengford
       U.S. Attorney's Office
       PO Box 2638
 4     Sioux Falls, SD 57101-2638

 5         -and-

 6     Mr. David K. Gaston
       U.S. Department of Agriculture
 7     1400 Independence Ave, S.W., Room 3311
       Washington, DC 20250

 8         -and-

 9     Ms. Chu-Yuan Hwang
10     U.S. Department of Agriculture
       1400 Independence Ave, SW
11     Washington, DC 20250

12                         for the Defendant

13

14

15     COURT REPORTER:

16     Jill M. Connelly, RMR, CRR
       U.S. Courthouse
17     400 S. Phillips Ave.
       Sioux Falls, SD 57104
18     Jill_Connelly@sdd.uscourts.gov

19

20

21

22

23

24

25
```

```
 1              * * * * *  MAY 25, 2016  * * * * *

 2        (In open court, counsel present, at 3:15 p.m.)

 3              THE COURT:  Mr. Gaston, are you ready to

 4    proceed?

 5              MR. GASTON:  I'm ready.  Good afternoon.  I

 6    would like to thank the Court and counsel for allowing

 7    me a moment to make a closing argument on behalf of

 8    the United States Government.

 9              Over the last two days we have touched on many

10    issues, but at the core of this trial is a fundamental

11    legal question.  Does the information requested by the

12    Argus meet the legal standard for withholding under

13    Exemption 4 of the FOIA?  The testimony over the last

14    two days offers a clear answer.  Yes.

15              Exemption 4 of the FOIA asks three things.

16    First, is it commercial or financial information?

17    Plaintiff has stipulated to this already.

18              Second, that it was received from a person, as

19    defined by law.  Even using a simplified understanding

20    of how the USDA records and keeps SNAP redemption

21    data, the requested information from the Argus, one

22    can reasonably conclude this information originates

23    from the retailers, and not the Government.

24              The third question, is this information

25    confidential?  Just last year in the Madel decision,
```

1    the Eighth Circuit confirmed that a record must be

2    withheld as confidential where release of that record

3    may cause substantial competitive harm.

4         In fact, the Madel decision found substantial

5    competitive harm in a release of submitter data that

6    would reveal, and I listed three, and I quote, "Market

7    shares, inventory levels, and sales trends."

8              THE COURT:  So you are only arguing that

9    it's confidential, not that it's privileged?

10             MR. GASTON:  I'm arguing that it is

11   privileged, and I'm arguing that it's -- oh, I see

12   what you're asking.  I'm focusing my argument on the

13   confidential based on the substantial competitive

14   harm.  It's privileged and confidential, I've put

15   together as substantial competitive harm, based on the

16   cases.

17             THE COURT:  But what I'm trying to do is

18   narrow it.  Are you only arguing that it's

19   confidential?

20             MR. GASTON:  Your Honor, may I take a moment

21   to look at the case law to confirm the component that

22   I'm -- I do not want to abandon one component while

23   arguing the other.

24             THE COURT:  Sure.

25             MR. GASTON:  Thank you.  Your Honor, that is

1    correct.  We have never argued the privilege.

2              THE COURT:  All right.

3              MR. GASTON:  I would refer back to the Madel

4    decision.  The Madel decision found substantial

5    competitive harm, as I mentioned, in market shares,

6    inventory levels, and sales trends.

7              THE COURT:  So many of the cases that I

8    looked at dealing with whether it was confidential

9    dealt with information that the Government had gotten

10   from one party, and whether the release of that

11   information would then impact them, because all of

12   their competitors would have that information about

13   that one party.

14            I didn't see any cases where it was release of

15   information from everybody similarly situated.

16             MR. GASTON:  Your Honor, I would argue the

17   Madel decision, even though it only included four

18   particular parties, involved one hundred percent of

19   those parties, and as those parties responded, the

20   case looked at a declaration from a DEA official who

21   considered that information as a statement that they

22   made to the Court.

23            So, in fact, what's interesting about the

24   Madel decision, the affidavits did not come -- excuse

25   me.  The declaration did not come from the retailers,

1    but from a Government official herself.

2          What I would like to do to distinguish the

3    cases that you reference is I looked first to the

4    Eighth Circuit, and I looked towards other cases in

5    the D.C. Circuit and others.

6          I would say that each individual retailer who

7    has submitted data, all of them should be considered

8    as individuals, and that competition should be

9    considered as competition that surrounds those

10   individual retailers in each particular instance.

11         I don't think grouping them together

12   eliminates the individual competitive harm that each

13   retailer who has submitted information might receive.

14         THE COURT:  So let's talk about some other

15   Government programs.

16         For instance, the Department of Ag pays

17   benefits to individual farmers that are here in

18   South Dakota.

19         MR. GASTON:  Yes.

20         THE COURT:  And that information is public.

21         MR. GASTON:  Your Honor, to my knowledge,

22   not all of that information is public.

23         In fact, under the most recent Farm Bill, and

24   I believe the one before it, a class of information

25   which is known as GIS information, geospatial

1    satellite type information, is explicitly removed from

2    that, because, based on a Department of Agriculture

3    decision, that when that information went out, it was

4    competitively harmful.

5              THE COURT:  But I know information has been

6    published in the Argus Leader that listed, for

7    instance, the top 20 people, producers in

8    South Dakota, and how much they received in ag

9    subsidies.

10             MR. GASTON:  Right.  But those subsidies --

11             THE COURT:  And wouldn't that cause some

12   competitive harm to them as compared to other

13   producers?

14             MR. GASTON:  I am not an expert on the farm

15   subsidies, the nature of the subsidies that those

16   farms have received.  And I am not an expert on what

17   those subsidies might have done to the competitive

18   nature or position of those farms.

19             What I am an expert on is what the information

20   requested by the Argus does, in terms of the

21   competitive nature of that information, in the

22   complete absence of that information in the

23   marketplace by those affected retailers of the

24   information requested.

25             So while I cannot create why I'm not

1    sufficiently informed of the case to which you refer,

2    to the information to which you refer, to create a

3    one-for-one comparison, I can say that a competitive

4    harm element in this particular set of information in

5    this particular matter is clear.

6            THE COURT:  So another area I was thinking

7    about are physicians and medical providers, and they

8    get Medicare and Medicaid proceeds.  I believe that

9    that information is publicly available.

10           MR. GASTON:  Your Honor, I believe I may

11   disagree with you.  I believe there was case law on

12   that particular topic, where there was a ruling that

13   went one way, and then it was reversed.  I don't have

14   those cases in front of me, so I cannot confirm it.

15           But my understanding is that a Medicare case

16   went the other way, and that Medicare information,

17   sorted by physician, is not available.

18           I can state from my experience.  I have

19   physicians in my family, and they were concerned about

20   this issue.

21           So when this issue actually did not end up

22   coming out, as you described, it was viewed as a

23   relief, because this information they, too, viewed as

24   confidential.  I believe the case you cite is from

25   Florida.

```
 1              THE COURT:  Well, actually what I'm citing
 2    is an article that I read in USA TODAY a number of
 3    years ago that identified the top 10 people or top 10
 4    entities that received Medicaid or Medicare payments
 5    and the dollar amounts that they had received.
 6              MR. GASTON:  Also worth exploring is what
 7    exemption that information was held under.  For
 8    instance, if it was a larger entity, and they were
 9    using Exemption 6, rather than Exemption 4, then what
10    you would have in the case would be a situation where
11    the Medicare redemptions would perhaps reveal too much
12    of those individual doctors' information.  Right?
13    Rather than what we are talking about here with
14    Exemption 4.
15              So without the case in front of me and without
16    being fully versed in the exact nature of the case you
17    described --
18              THE COURT:  I'm telling you it's not a case.
19    It's a newspaper article that I read that listed the
20    names of the providers and the amounts that they
21    received.
22              MR. GASTON:  Right.  I guess the case that
23    supported the release of the information coming out,
24    as you describe.  So I understand the outcome you put
25    forth before me.
```

1    However, I do not understand the genesis of

2    that information, nor do I understand exactly where

3    that information flows, and those doctors are entities

4    as you describe commerce.  Perhaps a hospital has a

5    different sort of argument against the release of

6    information than an individual physician.

7    So you said the top 20 entities.  I did not

8    read that article, Your Honor, so I do not know

9    exactly to which you discuss.

10   THE COURT:  Okay.

11   MR. GASTON:  Now, while Exemption 4 is

12   expressive on the must be withheld, it is silent on

13   how an agency might reach this decision.

14   All that is required, as affirmed by the

15   Eighth Circuit, is that an agency provides affidavits

16   that state with specificity the justification for that

17   decision.

18   The Madel Court found that an agency, if

19   sufficiently informed, can even support this

20   determination on their own.

21   An agency is not charged with the task of

22   soliciting a majority, a plurality, or even an

23   informed minority, though I argue the USDA has

24   achieved all three.

25   The task is for the USDA to support the

1      decision to withhold, not on generalized allegations,

2      but with specific information and without bad faith.

3      If the USDA has met this standard, I believe that this

4      matter can be resolved.

5              I believe the USDA has met this standard.

6              Exemption 4 is also silent on the public

7      policy objective an agency must engage.  Significant

8      competitive harm is a question of facts and figures,

9      data and analysis.  Withholding decisions by the USDA

10     are based on these factors.  Policy, Your Honor, is

11     not part of this process.

12             Your Honor, the defense has offered compelling

13     narratives from a diverse slate of knowledgeable

14     stakeholders who understand their business and their

15     competition.

16             THE COURT:  So prior to this case, has USDA

17     ever argued that Exemption 4 precluded the release of

18     this type of information?

19             MR. GASTON:  Are we referring to SNAP

20     redemption data 2005 to 2010?

21             THE COURT:  Yes.  That's the issue before

22     me.  Or for any time period.  I didn't mean to limit

23     it to this time period.

24             MR. GASTON:  The understanding was that

25     under U.S.C. 2 -- I'm sorry, the statute escapes me.

1          Under the statute, the information was not

2     allowed for release, and the belief was also and

3     as promulgated through our own regulations.

4     7 C.F.R. 278.1(q), I believe, is information was not

5     allowed to be released.

6          It was only after the decision by the Eighth

7     Circuit in the Argus Leader Media case in 2000,

8     January 14, I believe that's correct, Your Honor, that

9     we had to begin to start looking at this matter in a

10    different light.

11         We have been understanding that Exemption 3

12    and the law, both 278.1 and 278.1(q), 7 C.F.R.

13    278.1(q), were the statutes and the regulations that

14    sufficiently were being used to keep this information.

15         This is notable, Your Honor, because it was

16    not until a few years ago that the Court and Congress

17    made clear that a statute was -- a withholding statute

18    had to sort of have preamble language within the

19    statute itself.

20         The law that we were using had not been -- it

21    was an old law and had not had that sort of charge

22    language at the beginning of it.  So we didn't have

23    the certainty that a statute, if rewritten today,

24    might have.

25              THE COURT:  So this is the first time

1    that --

2            MR. GASTON:  This is the absolute first time

3    that we've looked at this information under

4    Exemption 4 of the FOIA, because we had felt confident

5    that, until recently, that this information was

6    properly withheld under Exemption 3 of the FOIA.

7            THE COURT:  So no other Court has considered

8    the argument that you are making here today with

9    regard to this?

10           MR. GASTON:  With regard to this particular

11   data, under this particular exemption, I do not

12   believe that a Court has made.

13       Now, I believe that parallel decisions have

14   been made.  As you mentioned, the Medicare case, I

15   would like to take a look before I make that assertion

16   directly in Court.

17       But in terms of SNAP retailer redemption data,

18   no, I do not believe so.  Though I will say that there

19   has been protection put forth, for instance, for

20   others towards their information.

21       For instance, if the Argus sought the

22   information on an individual's SNAP redemptions.  I

23   use "redemptions" in a careful way here, because I

24   understand it's had different shapes throughout the

25   course of this case.  That would not be allowed out

```
 1    the door.  But there would be different sorts of

 2    redemptions.

 3         The only reason I raise that is because this

 4    information is understood to have some metrics, some

 5    nexus of protection in any form it's had.  A lot has

 6    been kept at the USDA.

 7         THE COURT:  So other than Medicare data, is

 8    there any other general group of data that would be

 9    similar to the SNAP benefits or Medicare payments?

10         MR. GASTON:  May I have a moment to confer

11    with counsel?

12         THE COURT:  Sure.

13         (Off the record discussion)

14         MR. GASTON:  After conferring with counsel,

15    I cannot confirm the response to your question, though

16    I am willing to look it up, and I can offer an answer.

17         THE COURT:  Okay.

18         MR. GASTON:  I'm sorry.  Could you remind me

19    of the question so I made sure that I answered fully?

20         THE COURT:  Well, I'm just wondering if

21    there are any other, rather than an individual who is

22    trying to keep information private, if there are

23    groups of people who are all receiving a Government

24    payment; so physicians that are providing Medicare

25    benefits; grocery stores that are getting SNAP
```

1    benefits; you know, entire classes of people that are

2    getting some type of Federal payment.

3                MR. GASTON:  Yes.  I don't know that I've

4    seen a distinguishment of an individual and a group,

5    especially when that group is construed of

6    significantly independent individuals.

7                Even though there are trade associations and

8    other sort of groupings, these are individual

9    retailers who compete against each other, even within

10   a trade association, even within an organization or a

11   group.

12               Each one competes against Walmart.  Each one

13   competes against their neighbor.  Each one competes

14   against, you know, any retailer that we've seen come

15   before the Court.

16               THE COURT:  And I understand that you may

17   lump them all together.  But I'm trying to find out if

18   there are other large groups of people that together

19   are claiming that it's confidential information.

20               MR. GASTON:  Under Exemption 4.

21               THE COURT:  Under Exemption 4.

22               MR. GASTON:  Again, Exemption 4 is, I think,

23   a new approach for this protecting this information

24   from disclosure, because we had the longstanding

25   understanding that Exemption 3 would be the

1    appropriate way to withhold it.

2              THE COURT:  And I'm looking for --

3              MR. GASTON:  Not to say that Exemption 4 is

4    inappropriate.  I'm only saying that it was sort of

5    the first pass that the statute made clear,

6    Your Honor.

7              THE COURT:  Right.  And I'm trying to see if

8    there are other groups, like physicians getting

9    Medicare benefits.

10             MR. GASTON:  I can look into this,

11   Your Honor.

12             THE COURT:  Okay.

13             MR. GASTON:  I believe that we cited one of

14   those cases in our brief, but I just don't have them.

15   I'm just not prepared on that particular issue.

16             THE COURT:  Okay.

17             MR. GASTON:  Yes.  So the defense has

18   offered compelling narrative from a diverse slate of

19   knowledgeable stakeholders who understand their

20   business and their competition.  All have made clear

21   the nature of the confidential business information

22   the Argus asked the USDA to provide.

23             The Eighth Circuit has found that the FOIA

24   prevents disclosure when disclosure is likely.

25   "Likely," Your Honor, is the standard the

1    Eighth Circuit uses to cause competitive harm.

2            Through testimony today, yesterday, through

3    the USDA RFID analysis, and through other filings with

4    this Court, the USDA has met the standard for

5    withholding under Exemption 4 of the FOIA.

6            Thank you, Your Honor.

7            THE COURT:  Thank you.  Mr. Arneson?

8            MR. ARNESON:  Thank you, Your Honor.

9            Before I begin, maybe I can help clarify the

10   medical question that you had on Medicare payments.

11           I don't have the case in front of me, but in

12   the course of my research in the last few years, I

13   think a couple of years ago what happened was a

14   longstanding injunction in Florida, a District Court

15   in Florida, that had prohibited this Medicare

16   information from being disclosed was lifted.

17           It was lifted, and I'm not going to

18   overstretch myself here, but there had been

19   significant pressure, and the Court, I think, finally

20   said, "Enough of this."

21           Then whoever is in charge of Medicare -- is it

22   HSH?  CMS.  They changed their policy.

23           So that's probably the article that might have

24   come out.  So they do not cover that up anymore.  But

25   it wasn't by Court decision, the Court decision.

```
 1            THE COURT:  Okay.  Well, and it makes sense

 2    that it was from Florida, because my recollection of

 3    the article was that like the top four or five

 4    recipients of payments were all from Florida.  They

 5    were amounts quite higher than anybody else

 6    nationwide.

 7            MR. ARNESON:  Yes.  It's probably not

 8    coincidence that the Court decision was in Florida,

 9    but also not that Florida is the highest population --

10            THE COURT:  That's true, too.

11            MR. ARNESON:  -- being my age and older.

12    That's one place I can go to feel young.

13            Anyway, I won't -- I don't want to

14    underestimate the value of the basic legal burdens and

15    presumptions in this case, but I think the Court has

16    read them enough times, that if she reads them one

17    more time, she'll probably hold it against the person

18    who mentions it.

19            But I do need to touch base and say this is

20    FOIA.  Transparency is what it's all about.  It's what

21    the Government wants.  From the President on down, to

22    the lowest level Federal employee, it is the desired

23    effect.

24            And to that end, exemptions, the nine listed,

25    of which we're on No. 4, are to be narrowly construed,
```

1    and the requester is always to be given the benefit of

2    the doubt, and essentially to fulfill or achieve the

3    purpose of FOIA.

4           So that being said, I think my first and

5    foremost concern in this case, and I think it was

6    pretty clear in my inept presentation, was I was

7    trying to establish, and I think we finally did, that

8    despite flow charts and EBTs and all the rest of it,

9    this is, in fact, a Government program.

10          This is, in fact, a situation, and however you

11   want to cut it, the shorthand version is the

12   Government is paying SNAP retailers, who voluntarily

13   participate in a program to provide food for the

14   people who need it, and those people who are

15   considered to be worthy of our attention because they

16   cannot afford to buy nutritious food for themselves.

17          THE COURT:  So do you concede that the

18   information requested is financial, and it's obtained

19   from a person, so the only issue I have to determine

20   is if it's confidential?

21          MR. ARNESON:  I'd love to say yes, but I

22   have to say that "obtained from a person" makes it --

23   yes, the original information.

24          I mean the Government is not going to pay

25   retailers out of the clear blue.  I mean they're not

1    giving out handouts to the retailers.  There has to be

2    something that justifies what they're paying out.

3           I guess my point is, that's not the

4    information we're asking for.  Yet there's a reason

5    why the Government is paying it out, but that's what

6    we want to know.

7           We want to know what is the Government paying,

8    taxpayer dollars, to people voluntarily participating

9    in the program?

10          The other side of it, through the EBT process

11   is a matter that facilitates the information, yes,

12   that gets to the Government.

13          But I don't want to confuse the issue by

14   saying it's anything more than what would happen

15   if -- I'll use the example -- Uncle Sam walks into the

16   store with a SNAP recipient and said, "Pick out 12

17   items, and I'll pay for it."  I don't think anybody

18   would be arguing that there the Government is

19   obtaining information, critical information that has

20   anything more than completing the closed circuit.

21          That information doesn't have any independent

22   existence outside of the functioning of the retailer

23   in the program itself.

24          It's not the kind of information that you were

25   isolating earlier in your question about people who

1    are maybe wanting to engage in a Government contract.

2    Say the guy who makes helicopters, and he's trying to

3    get the Government contract for that.

4         Let's make it simple.  Let's make it the food

5    industry.  What if people had to bid, bid or somehow

6    get the Government contract, for a certain

7    neighborhood to participate in SNAP and it wasn't an

8    open-ended thing?

9         Let's just assume that Mr. Ellis is the guy

10   that is going to get the contract for Minnehaha

11   County, and the Government said, "Okay, we're going to

12   give you the contract, but part of the deal here,

13   Mr. Ellis, is we want to know all your future land

14   acquisition intentions."  "Okay."  He said, "Well, I

15   want this contract, so here it is."

16        Now, that's the kind of information clearly

17   that is coming to Government, obtained from a person,

18   whether it's through a third party or not, and I grant

19   you that that can be through a third party if it

20   pertains to the person supposedly being injured.

21        But that's a whole different equation.

22             THE COURT:  Well, those cases are the ones

23   that I was referencing with Mr. Gaston.

24             MR. ARNESON:  Yes.

25             THE COURT:  It's normally one person trying

1    to get a contract.  And if the information is

2    released, his competitors are able to use that against

3    him in future bidding.

4         MR. ARNESON:  Quite different from,

5    "Everybody, what are we earning because we decided to

6    participate in the Government program."

7         And, frankly, to take the Mr. Ellis example

8    one step further, I'm not quite sure that anybody

9    would say, "Okay, Mr. Ellis, you had a contract to

10   provide something to the Government, and we're going

11   to pay you for it," I'm not sure that USDA or any

12   other agency would be saying to us, "The amount that

13   Mr. Ellis is making from the Government is a secret."

14        The information going in about his land

15   acquisition intentions perhaps, but I don't think

16   typically if a person enters into a contract with the

17   Government, that what Government pays them is a

18   secret.

19        THE COURT:  Because the amount, for

20   instance, if they were successful in the bid

21   competition, whoever got the bid, the amount of that

22   Government contract would be public information.

23        MR. ARNESON:  I think it would be.

24        You know, I think the Federal Government

25   doesn't have quite as -- other than FOIA, which is the

1    obvious catch-all.

2         I mean in South Dakota we have certain

3    categories that information is specifically open or

4    closed, and I have not actually found a statute that

5    said "all Government contracts are open," but I kind

6    of assume that we wouldn't be having this same

7    discussion if that were the case.

8         Government program participation, voluntary,

9    it just doesn't fit into Exemption 4.  Congressional

10   intent, it doesn't match what they designed

11   Exemption 4 to do.

12        I think the Court hit upon it, because it's

13   not singular.  It's not one person against the world

14   or six people against the world.

15        This is going to apply to 320,000 people

16   equally.  I'm not claiming that the effects of having

17   that information available is going to have an equal

18   affect on all of them.

19        But let's remember that trade associations are

20   not -- and I think it was pretty clear, when we're

21   talking about Walmart being a member of one of the

22   trade associations, I'm pretty sure that Food Market

23   Institute, when they wrote a declaration in favor of

24   concealment in this case, I doubt they were speaking

25   -- if they were speaking for Walmart, I think

everybody would be interested in saying, "Well,
Walmart is the one that has been listed in
everybody's, the top of everybody's list of the
predators."

If Walmart is a member of FMI, and FMI is
saying, "Yeah, we don't want disclosure," then that
kind of takes the wind out of the sails of the idea
that the big, bad guy is going to sit back and twiddle
his thumbs.

Plus, I would point out that I didn't see
Walmart responding, commenting to the RFI, saying,
"Yeah."  I mean they could have gotten some real
public good out of saying, "For transparency reasons
and for the American taxpayer, who deserves to know
where their money is going, yes, let's have at this
information," and then take advantage of it.

I think the natural instinct of people faced
with a prospect or option, if they're given an option
of, "Do you want to give me or the world a view of
some personal information or something that you
consider to be yours, or do you not want to give it,"
I don't think most of us are looking for a rational
reason to give that information.  I think our first
instinct is to recoil and say, "I'd rather not."

I think that's what we ended up with in the

1    RFI response.  We had, and I'm not stretching here to

2    say hundred of thousands of people who didn't care

3    enough to say, "Yeah, that's a problem for me."  We

4    ended up with a few more than 80.

5         And those people, I think it was clear,

6    weren't necessarily strongly identified with

7    establishing, or even suggesting, let alone proving,

8    the likelihood of substantial competitive harm.

9         THE COURT:  So let me take you in a

10   different direction for a minute.

11        MR. ARNESON:  Sure.

12        THE COURT:  One of the witnesses made a

13   comment about the fact that when retailers signed up

14   for this program, they assumed that the payments to

15   them would be exempt, and that some of those retailers

16   may not have signed up if they knew it was going to be

17   public information.

18        MR. ARNESON:  I think that was Mr. Larkin.

19        THE COURT:  Has there been any thought of

20   making the information public, but, for instance, from

21   this point forward, so retailers would have the option

22   to say, "I don't want to participate if it's going to

23   be public"?

24        MR. ARNESON:  Nobody has approached me with

25   that offer, and I haven't discussed it with my client.

1          I think, though, that to be -- to try to come

2     up with an honest answer to that right now, I think my

3     approach would be to be consistent with the way I've

4     approached this case the whole time, and that is,

5     "That's unfortunate, but I don't know why my client

6     and why the public, in general, especially with the

7     reason for FOIA in the first place, I don't know why

8     we have to suffer if the Government made a mistake

9     with these people."

10         I don't mean to be too harsh about that, but

11    that really, you know, "We're sorry that it happened

12    that way, but if you don't want to continue, you can

13    get out," that doesn't really fall in, I don't think,

14    to Exemption 4, anyway, because I think Exemption 4 is

15    under the standard of likelihood or likely to cause

16    substantial competitive harm to those supplying the

17    information.

18         That begins with the inquiry:  Is there

19    competition?  In this case I think it was all agreed

20    from the beginning, well, I don't know how much

21    competition there is for SNAP people, in particular.

22         I agree with the experts and with the people

23    in the field.  Grocery business is very competitive.

24    But that means that the harm has to be coming from the

25    competition.

1          What you're suggesting is a harm that

2     potentially is coming from the fact that they were

3     told by an Agency that their information wasn't going

4     to be disclosed, and now it is.  So I don't even see

5     that in the equation.

6          However, I'm not saying that I'm going to be

7     so close-minded as to say, if somebody came with some

8     sort of legitimate suggestion, that we wouldn't take

9     it under advisement.

10         But I think getting back to whether this is

11    even an Exemption 4 case, I think it's a very

12    legitimate issue that we bring up, because the case

13    law, and I think Stephanie and I probably are both

14    sick of looking at it, it keeps -- it doesn't answer

15    that question, because it's not, I don't think, it's

16    not something that ever would have ever really

17    deserved to be in the Court system.  I don't think

18    this is an Exemption 4 case for participating in a

19    Government program.

20         Now, assuming I have to deal with Exemption 4,

21    and I will answer your question, yes, we have no -- I

22    mean we can't exactly argue this isn't financial or

23    business information.

24         But the "obtained from a person" does continue

25    to bother me, because I don't think -- I mean I think

1        that necessarily goes back to are we talking with a

2        closed circuit?  Are we talking an open circuit of the

3        information?

4              Again, using the Ellis example, that's the

5        kind of information that I think Congress was

6        intending -- or the Courts that imposed this.  I mean

7        this, as we all know, is case law, case law standard.

8              I think "obtained from a person" came about in

9        a context that was not the back half of a Government

10       program or a Government contract.  I think it was

11       intended to be something -- well, I guess it was

12       intended to be something like the Ellis example, where

13       he has to divulge specific information about himself

14       to be doing something that all the rest of the world

15       is not involved in.

16             But, anyway, I don't want to belabor the

17       "obtained from a person," because I think I tend then

18       to get back to using that same -- that same argument

19       sort of predominates in the very first argument that

20       I'm making, that this isn't an Exemption 4 case.

21             So I think, yes, we can jump down to the

22       substantial competitive harm issue.  That would be

23       logically the most significant appearing legal

24       standard that we have to deal with.

25             What I would say about it is this.  I don't

1    want to minimize what was presented here on behalf of

2    the Government.  I also don't want to minimize what

3    the Argus Leader is saying.  I think both of them

4    intended to present an accurate reflection of what

5    concerned them.

6          But I never once really got beyond the point,

7    with the Government's evidence, that, yes, there are

8    people who worry about competition.  There are people

9    who worry -- and that's a logical thing for a

10   businessman.  I mean competition has got to be the

11   No. 1 concern.

12         We also heard from the same people that

13   competition is good for America.

14         I would love to tell this Court that this case

15   could be decided simply on the fact that competition

16   is good for the SNAP Program, which I think it is,

17   because I think competition, if it does lead to lower

18   prices, is going to lead to greater buying power by

19   the SNAP recipients.

20         But that isn't yet the standard.  We have to

21   deal with the likelihood of substantial competitive

22   harm.

23         I have not yet seen a definition of "likely"

24   or "substantial" in a Court decision that is any more

25   helpful than the definitions I've been using

1      personally throughout my analysis, weak as that has

2      been, from Merriam-Webster.  Nobody has dissuaded me

3      from believing those are legitimate.

4          I don't think I need to tell the Court what

5      those words mean.  It's not simply creating a

6      prospect.  It's going way beyond that.  "Likely" and

7      "substantial."  I mean that's defined to be highly

8      probably that there's going to be significant harm.

9          Well, I guess I should go straight to my

10     definitions.  I put them in my pretrial submission.

11         "Likely" is defined as "having a high

12     probability of occurring or being true; very

13     probable."  This is the Merriam-Webster's Collegiate

14     Dictionary, 10th edition, 1993, another thing that

15     dates me.  You don't even want to know how old my

16     Black's Law Dictionary is.

17         "Substantial" is defined as "considerable in

18     quantity; significantly great."  That's a pretty high

19     standard.

20         What I heard throughout the last couple of

21     days, and actually quite longer than that, is we're

22     worried about competition.  This is information that

23     will probably be used, but it was never really well

24     established how effectively it will be used.

25         Nobody on our end of it -- I mean Dr. Volpe is

saying, "I think it's a flexible enough concept that
it could be somewhat detrimental; it could be somewhat
beneficial."

But I don't think there's a definitive answer
that this is likely to cause substantial competitive
harm, and I think if that were logical, I think the
Government would have come to that conclusion a long
time ago and dispensed with the RFI.  I don't know
that they needed to go through the RFI.  I guess they
can dispute that.

But I think the two documents that they used,
their own regulation and the executive order, both
clearly identify that if you believe in this defense,
you don't have to do this Notice stuff.

So I'm not really sure why they did, unless it
was not intuitively obvious to them that they had a
good defense.  I don't blame them for wanting to get
more expertise, but it seems somewhat indicative that
if a party is uncertain, that might reflect upon the
logic of the conclusion.

And I've always thought it was an illogical
conclusion.  I'm not so sure that USDA didn't have
some doubts about the logic of the conclusion, too,
that the release of this information was going to
cause the substantial competitive harm, or was likely

1    to, that was necessary to reach that standard.

2          So when they went to the retailers, what did

3    they come back with?  Yes, they came back with some

4    people have had legitimate concerns.

5          But the most focused of them all, in my

6    impression, and I think Mr. Hays was very well

7    intentioned and congenial and all of that.

8          But I think obviously, and the way the

9    Government must have agreed with me, in the use of

10   Gwen Forman, and she's speaking for her own store

11   based on her knowledge of her own information, and

12   then extrapolating or suggesting that somebody else

13   will be able to do the same.

14         Well, yes, I understand that Ms. Forman, or

15   anybody in her position, who owns stores or a store

16   can identify what their SNAP sales are and compare it

17   to their overall sales and find a correlation.  But

18   how that generates to the point of being helpful or

19   harmful in the big picture, it's pretty nebulous.

20         I'm not saying that it might not add to their

21   competition from whatever that outfit was that she was

22   -- Quik Mart, or something like that.

23         But nobody also said to Cumberland, "Okay, if

24   that's your strategy, to pull back and stay there for

25   a while, because you just closed out in four states."

Nobody is forcing them to take that approach.

I think she did say that if they decided to change tomorrow, a different approach, and they saw the opportunities, they've got the same access to the same information.

So the other thing that I was missing from the testimony was there must be a great, to quote all of our favorite President, "the silent majority."  Maybe that was Agnew.  I don't know.

I never quite got a sense of who was going to be targeted, and what levels they were looking for, and what was going to be too low to be interesting, perhaps too high to be interesting.  Nobody actually established, through testimony, what exactly they were expecting to find or would be their line of demarcation if they got this information.

My impression is that's because of the 300,000, I don't know, roughly let's just say 300,000, maybe it's 280,000 now in the SNAP Program, that when these numbers come out, if they were to, maybe 275,000 of them, you don't even blink.  You say, "Well, that seems pretty normal."

Maybe the 500 that are really, really over the top, maybe they are all trafficking.  I think we all have seen enough media reports of that issue to know

1    that there obviously is a great middle-of-the-road

2    group out there that isn't going to be impacted at all

3    one way or the other.  I mean nobody is going to

4    target them, I mean even if targeting were the

5    objective here.

6         Again, I'm not suggesting that just because

7    somebody has got good sales volume for SNAP, that they

8    are going to become prey for the predators.  That

9    could be exactly the opposite of what happens.

10        Quite honestly, that assumes they have no

11   defenses to fight back.  That assumes that these

12   people who come in and prey upon them are going to

13   know exactly what they are doing and how to do it and

14   are going to be successful.

15        Who knows?  They may just have totally screwed

16   it up, and they may say, "Whoa, they are really good

17   at what they do.  We probably want to regroup here,

18   and, yeah, their SNAP sales are really good.  We're

19   not going to take enough to stick around."

20        That's possible.  And I have not heard enough

21   to convince me about this being the substantial

22   competitive harm, again, significantly great

23   competitive harm being likely.

24        The only numbers I've really heard, and I did

25   finally hear I think from the last witness who -- and

```
1    I'm not going to object, but I think he did more than

2    rebut, but that's fine.  I want the truth to come out,

3    and if people have opinions, let's hear them.

4         I think the range of SNAP volume that he was

5    talking about went from probably zero, because there

6    are four stores that don't have any SNAP, up to I

7    think he said as high as 50.

8         But what really surprised me and I think got

9    my attention was Miss Forman, and I know this is not

10   information that probably needs to leave this

11   courtroom, but she gave some SNAP data that I thought

12   was shockingly low, an average of I believe

13   1.5 percent of total store sales.

14        MR. GASTON:  Objection.

15        MR. ARNESON:  If you want me not to mention

16   this, I will.

17        MR. GASTON:  I would prefer, sir.  It's not

18   a closed courtroom anymore.

19        MR. ARNESON:  Okay.  A very low number, a

20   very low percentage, I thought, relative to the

21   potential harm.

22        I guess most of the harm, I know that there

23   was some extraneous or tangential harms that were

24   suggested, and it might not all be SNAP business

25   people are after, but the basic idea, I think, was
```

1    that the good SNAP volume is going to cause other

2    people in the SNAP Program, or not in the SNAP

3    Program, to get into the SNAP Program, move in and try

4    to take that stuff away.

5         I guess Cumberland, which has every one of its

6    stores in the program, and I think seems to be a

7    pretty successful operation.  I mean I've actually

8    been in the Northeast, and they've got some nice

9    looking stores.

10        THE COURT:  I think she said there were like

11   four stores that are not in SNAP.

12        MR. ARNESON:  Okay.  That's right.  They

13   were the kiosks.  Yes.

14        It just strikes me that that's a fairly small

15   amount of business to, first of all, go after, make

16   huge plans over, and I'm not saying that's the exact

17   percentage for all stores.  But I think we would need

18   to know a lot more about what those percentages are

19   before we start saying, "Oh, my goodness."

20        And I don't remember if anybody tried to come

21   up with an overall across-the-nation percentage, but

22   all the numbers I heard were pretty low.  That means

23   we're generally talking about going after a very small

24   segment of that store's sales, in the first place.

25        I know there's this low margin in the grocery

1    business, but this really minimizes the impact,

2    I think.

3           So I know that this is supposed to be short,

4    and I know that I wasn't even interested in talking.

5           But I think it's really critical that we keep

6    in mind what this, first of all, what kind of case

7    this is, that it is a voluntary participation in a

8    Government program.

9           For that reason, I think, as the Court is

10   aware, I did offer in my pretrial submission the

11   prospect that no -- case law doesn't get developed

12   unless Judges think there's a good reason for it.

13   Otherwise, it's stare decisis, precedent, whatever.

14          But there's a lot of good case law that has

15   been developed, because at some point along the line

16   somebody said, "This set of facts makes sense to

17   create something important here," and I think this is

18   that case.

19          And when it comes to Exemption 4 analysis of

20   cases that are in this context, which is a Government

21   program, somebody voluntarily participating, and the

22   information being requested is nothing more than what

23   they get out of that program, nothing really other

24   than that, quid pro quo, I think the Court, and I'm

25   asking this Court to take it under advisement, at

least, should consider there should be a fourth prong to the Exemption 4 test.

In my view, this is one aspect of the Exemption 4 test.  But this particular Exemption 4 test should not only have to be commercial/financial; obtained from a person; likely to cause substantial competitive harm; but if it is likely to cause substantial competitive harm, if that's a "yes," we should still have to balance that against the benefits, potential benefits to the public and the program itself.

The key here from Day 1, and it's what got me confused in the first place and probably forced me into going up to St. Paul, and my fault for not being better versed for this Court at that time.

But what I cannot wrap my head around then, and I still can't, is why the recipients of the SNAP Program are not priority here.  Quite honestly, this distracts us from that mission.

And by not taking into consideration the benefit, the competitive harm, even if that's a given, that that could do for the program by perhaps expanding competition, getting more retailers who are not prohibited.  Remember, there's an almost free entry into the retailer program.  The more

competition, generally the better.

Yes, there are going to be some that don't survive, and, yes, there may be some areas that might suffer for the competition driving other competition out.

The big picture, I think we heard here once, twice, maybe three times, from not my witnesses, but from their witnesses, competition is good for America. If competition is good for America, competition is good for SNAP.

For that reason, I would ask the Court to seriously consider, is this an Exemption 4 case, to begin with?  If it is, is there really a likelihood of substantial competitive harm?  And if that is answered even "yes," take that last step.

Now, I have one final --

THE COURT:  Let me go back to the language of Exemption 4, which says that it has to be information obtained from a person.

So I look at Exhibit 201-A where the witness added in the "Government bank" box underneath the EBT processor, with an arrow going from the Government bank up to the EBT processor.

I think there was also testimony that money was transferred from the Government bank to the EBT

1    processor's bank.

2         So information went from the Government to the

3    EBT processor and to the EBT processor's bank,

4    indicating that money was transferred on behalf of a

5    retailer vendor number, based on things that had been

6    approved.

7         If the information that you are requesting are

8    the yearly redemption amounts paid to each

9    participating store, isn't that information generated

10   by the Government and transferred out, rather than

11   obtained from a person?

12        MR. ARNESON:  Well, I agree with that, and I

13   know that's what the Eighth Circuit said for the

14   purpose of making its decision.  But I also understand

15   the Government's -- the USDA's point of view.

16        Yes, I'm asking for what the Government is

17   paying.  I'm not asking for what's been obtained.  But

18   I do realize their argument was at some point they can

19   create an origin of information that doesn't have to

20   be directly from the SNAP retailer.

21        Now, the fact that it gets into the Government

22   at some point in the chain before the final --

23        THE COURT:  Matt is trying to do whatever.

24   There.

25        MR. ARNESON:  I had put my exhibit in the

1    car, so I wasn't really clued in.

2          I guess I understand that "obtained from a

3    person" is a fairly liberal concept.  I never thought

4    it applied, because I didn't think we were asking for

5    that information.  I thought we were asking for the

6    other side of the transaction.  But I understood

7    that --

8          THE COURT:  Well, it kind of goes back to

9    the argument of when a person bids on a project, and

10   all of the bid information, the information they

11   submit is confidential, and it may impact or cause

12   substantial harm to the competitive position of the

13   person bidding, but the actual amount of the award

14   doesn't fall under an exemption.  It would be similar

15   to that argument.

16         MR. ARNESON:  Well, that's what I'm -- yes.

17   It's circuitous.  I would agree that whether you

18   consider it to be payment or redemption, that's why it

19   gets confusing conceptually.

20         I agree that either way, it's not secret

21   information.  I would agree that it's payment

22   information.  It's just the process that facilitates

23   the payment.

24         As I said, if it had been you walk into the

25   grocery store, you take what you want, and then the

1    store owner said -- bills Government, sends them a

2    bill.  "Yes, Joe, the recipient, came in and took some

3    bread.  You owe me 35 cents."  And the Government paid

4    it.

5         Yes.  I don't think the bill of the 35

6    cents -- well, yeah, it's obtained from Joe, but it's

7    really nothing more than the amount he wants to be

8    paid.

9         That's why when -- yes.  I've seen language

10   that when it's suggesting that the amount that a

11   person is being paid is dependent upon the

12   transmission of some ingoing information.  I'm saying,

13   yeah, but it's just what you have to do to be paid

14   under the system.

15        I mean it's just as if -- Judge, you provide a

16   service to the United States, and you get paid for it.

17   And I don't think anybody --

18        THE COURT:  And it's public.  My salary is

19   public.

20        MR. ARNESON:  Yes.  And I think most of

21   their salaries are public, too.

22        THE COURT:  I think they are.  All

23   Government employees are.

24        MR. ARNESON:  And if I had any, I would let

25   you know it, but I don't.  Probably after this case, I

1      probably won't.

2              So I don't have anything more.  If you have

3      more questions of me.

4              THE COURT:  No.  Thank you, Mr. Arneson.

5              MR. ARNESON:  Thank you.

6              THE COURT:  Mr. Gaston, did you have any

7      rebuttal?

8              MS. BENGFORD:  Just a few cases regarding

9      the -- well, I should let Mr. Gaston speak.  Sorry.

10             MR. GASTON:  Okay.  Your Honor, may I stay

11     seated, or would you like me to approach the podium?

12             THE COURT:  Either way.

13             MR. GASTON:  I will stay here, if it suits

14     the Court.

15             Your Honor, first you asked if information of

16     this sort was kept before.  We do have a case on

17     point.  We look -- pardon?

18             Oh.  Your Honor, I was sort of trying to

19     resuscitate argument earlier that I was not completely

20     informed on, and I focused on that.

21             I think Your Honor is most interested in the

22     "from a person" component.  Is that correct?

23             THE COURT:  Both that and the confidential

24     component.

25             MR. GASTON:  Right.  I see.

1              So information contained in a Government

2    generated report is obtained from a person if such

3    information came from a nongovernmental source.

4              There's been a lot of discussion about the EBT

5    system, and if I might offer the Court a short example

6    of how the system works and what's being sought, maybe

7    I could help clarify this system altogether.

8              I'm discussing High Country Citizens Alliance

9    v. Clarke.  It is 2005 WL 2453955.  At the time of the

10   drafting of this particular document, it was

11   unreported.  It was citing Public Citizen Health

12   Research v. National Institutes of Health, which is

13   209 F.Supp.2d 37.

14             So, yes, the Government believes this

15   information, indeed, comes from a person.  Yes.

16             Then the second part is that some rates and

17   reformulations information, supplied by a source

18   outside the Government, fall within protections of

19   Exemption 4.  The case that we support that with is

20   Public Citizen Health Research Group,

21   209 F.Supp.2d 44, and it cites Judicial Watch,

22   108 F.Supp.2d 28.

23             Here the language we quoted was, "Bank

24   obtained information from the insurance applicants

25   themselves, commercial lenders for the applicant, or a

1    purchaser of the goods at issue.  Each of these

2    entities is a person within the meaning of

3    Exemption 4."

4          So, Your Honor, what I believe and what the

5    Government believes is that when it's information that

6    comes from the retailer and it goes to the EBT

7    processor, this is a singular transaction that does

8    not speak towards Government spending at all.

9          What it speaks towards is this data recording,

10   the EBT processor.  If you cut the Government out of

11   the entire chain, the information would still flow

12   from the retailer to the EBT processor.  The EBT

13   processor then provides an accounting to FNS.

14         If I might use an example, Your Honor.  It's

15   much like if you bought dinner for a friend, and when

16   you got the receipt, you get two receipts inside the

17   black envelope.

18         One is the one you sign.  That executes the

19   transaction.  That tells your bank to pay the vendor.

20         The second one is one that you don't sign.

21   You keep for your notes.  Maybe you put it in your

22   personal Quicken.  Maybe you keep it in your pocket.

23   Maybe you throw it away.

24         We keep it, and we use it to help enforce and

25   manage the program.  That second receipt is what FNS

1    has, and that, Your Honor, is what is in the STARS

2    System.   There is no record of actual payment.

3              THE COURT:   Yes, but the Government document

4    would be my credit card company paying the other

5    entity.   That's my record.   It's not the retailer or

6    the grocery store's record.   That's my record.

7              MR. GASTON:   I'm sorry.   Reverting back to

8    the retailer analysis that we're looking at on the

9    page?

10             THE COURT:   I'm reverting back to the

11   Government bank putting money in to pay the EBT

12   processor.

13             MR. GASTON:   That's -- and the chart shows

14   that.   The Government does pay the EBT processor.

15   But --

16             THE COURT:   And I'm saying that is the

17   Government record.   It's not a record of a person.

18             MR. GASTON:   It is a Government -- okay,

19   yes.   The money from the Treasury, going to the EBT

20   processor, that is a Government record.

21             THE COURT:   Right.

22             MR. GASTON:   That's not the records --

23             THE COURT:   So then that's what I'm asking.

24   Does that fall under Exemption 4?   It was not obtained

25   from a person.   It's a record obtained from a

1    Government entity.

2            MR. GASTON:  Those particular records,

3    first, those aren't USDA records, so I can't speak to

4    them directly.

5            They do discuss payment, and, in fact, payment

6    information for SNAP, and this is sometimes ignored or

7    forgotten by counsel, is that this information does go

8    out.  We do put it for the total volume of the

9    program.  We do it by state.  We do it by zip code.

10   We even do it by county.

11           The only thing that holds us doing it on the

12   actual individual granular level is our belief that

13   the law prohibits it under competitive harm.

14           We are trying to follow the law, Your Honor.

15   That is the core of this case.

16           THE COURT:  Well, I understand that.  I'm

17   trying to figure out exactly how the law fits in with

18   this transaction and whether Exemption 4 actually

19   applies, if it's a Government record, rather than

20   something that's obtained from a person.

21           MR. GASTON:  I would like to delineate that

22   the information that is being requested in this

23   particular matter is information that's kept -- and I

24   can find the actual FOIA Request.  But it's kept in

25   the 2005, 2010 annual redemption data in the STARS

1    System.  Right?

2          That is an aggregation and a manipulation of

3    data received from the EBT processor.  That is

4    information that comes from the EBT processor to the

5    USDA, which is aggregated by that EBT processor from

6    data received on a daily basis from retailers.

7          That's the entire flow.  The payment part, we

8    have nothing to do with.

9          THE COURT:  All right.  Anything else

10   anybody wanted to add?

11         MR. ARNESON:  One thing, and I forgot to,

12   Your Honor.

13         I think, first of all, what's being described

14   here is the Government knows, within its recesses,

15   there is a record which has been acknowledged and

16   admitted in this case throughout, that records, keeps

17   track of the amounts that SNAP retailers get from the

18   Government for their participation.  I mean that's

19   clear.

20         And how we want to recast it because it goes

21   through a process, EBTs and credit cards, this bank,

22   that bank, and the other bank, it does not diminish

23   the fact that it is, in fact, what the Court is

24   identifying it to be, a Government payment and a

25   record of a Government payment.

1          The Government has to keep a record of those

2     payments.  It's absurd to think that they don't.

3          The other thing I have, Your Honor, and I

4     almost hesitate to bring it up, and it's a sensitive

5     matter, because I'm hoping this Court will make a

6     decision based without limiting itself to the 2005 to

7     2010 information, and might see fit to issue a ruling

8     that could have bearing on past, present, future.

9          But if the Court were to go against us on that

10    issue, I do believe we have to take into very serious

11    consideration what value, and God knows, I don't think

12    in 2011 I thought I would still be here in 2016

13    litigating this case, but what value 2005 to 2010

14    SNAP redemption information or SNAP payment

15    information, however you want to phrase it, what value

16    that could possibly have to people making plans in

17    2016.

18          I think there is case law that has been cited

19    in pretrial submissions and elsewhere that suggest

20    that worst case scenario, and we are not --

21          MR. GASTON:  Objection, Your Honor.  Outside

22    the evidence.

23          THE COURT:  I think I can apply my common

24    sense.  So the objection is overruled.  You may go

25    ahead.

1          MR. ARNESON:  Okay.  I didn't mean to stray

2     outside the evidence.

3          THE COURT:  Well, he's arguing there wasn't

4     any evidence that the value of 2005 to 2010 data would

5     be minimal at this point.

6          MR. ARNESON:  Oh, there was no evidence.

7          THE COURT:  And I said I can apply my common

8     sense.  So go ahead with your argument.

9          MR. ARNESON:  Yes.  I think you can apply

10    your common sense, and I think the case law suggests

11    we don't have to prove that six years have passed.  I

12    think there are plenty of cases that talk about stale

13    information.

14          Heaven knows, I think in this highly

15    competitive field, making changes everyday that we

16    heard about for the last two days, 2010, 2005, 2007

17    material probably is not going to be dispositive in

18    making decisions for 2016.

19          That's all I wanted to get across.  Thank you.

20          THE COURT:  So did either side want to

21    supplement your closings with written briefs, or do

22    you want me to rely on your pretrial submissions and

23    the summary judgment motions?

24          MR. ARNESON:  I'm comfortable, Your Honor,

25    without.  I don't want to write another word on this,

1    but I will.

2           MR. GASTON:  A moment, Your Honor.

3           MS. BENGFORD:  Your Honor, I do think we

4    will brief at least the "from a person" issue for the

5    Court.

6           THE COURT:  All right.  How much time do you

7    think you would need?

8           MS. BENGFORD:  Would 21 days be okay,

9    Your Honor?

10          THE COURT:  Sure, 21 days.  Do you want to

11    respond?

12          MR. ARNESON:  Yes.  I'll reserve the right

13    to respond.

14          THE COURT:  21 days.

15          MR. ARNESON:  Are we limiting it to that

16    issue then?

17          THE COURT:  I think that's all they wanted

18    to brief.  Do you want to brief more than that?

19          MR. ARNESON:  I don't.

20          THE COURT:  I'll give you 21 days to

21    respond, and then five days for a reply.

22        Anything else anybody wanted to bring up

23    today?

24          MR. ARNESON:  No.  Thank you for the Court's

25    indulgence.

1          MR. GASTON:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you.  I'll get an opinion

3    out as soon as I get your briefs in.  We'll be

4    adjourned.

5          (End of proceedings at 4:20 p.m.)

1    UNITED STATES DISTRICT COURT
     DISTRICT OF SOUTH DAKOTA  :SS  CERTIFICATE OF REPORTER
2    SOUTHERN DIVISION

3

4          I, Jill M. Connelly, Official United States
     District Court Reporter, Registered Merit Reporter,
     Certified Realtime Reporter, and Notary Public, hereby
5    certify that the above and foregoing transcript is the
     true, full, and complete transcript of the
6    above-entitled case, consisting of Pages 1 - 52.

7          I further certify that I am not a relative or
     employee or attorney or counsel of any of the parties
8    hereto, nor a relative or employee of such attorney or
     counsel, nor do I have any interest in the outcome or
9    events of the action.

10         IN TESTIMONY WHEREOF, I have hereto set my
     hand this 27th day of June, 2016.
11

12              /s/ Jill M. Connelly
                _____
13
                Jill M. Connelly, RMR, CRR
14              Court Reporter
                United States Courthouse
15              400 S. Phillips Avenue
                Sioux Falls, SD 57104
16              Phone:  (605) 330-6669
                E-mail:  Jill_Connelly@sdd.uscourts.gov
17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 53:12

## 1

**1** [3] - 29:11, 38:12, 53:6
**1.5** [1] - 35:13
**10** [2] - 9:3
**108** [1] - 44:22
**10th** [1] - 30:14
**11-4121** [1] - 1:4
**12** [1] - 20:16
**123** [1] - 1:23
**14** [1] - 12:8
**1400** [2] - 2:7, 2:10
**1993** [1] - 30:14

## 2

**2** [1] - 11:25
**20** [2] - 7:7, 10:7
**2000** [1] - 12:7
**2005** [7] - 11:20, 44:9, 47:25, 49:6, 49:13, 50:4, 50:16
**2007** [1] - 50:16
**201-A** [1] - 39:20
**2010** [6] - 11:20, 47:25, 49:7, 49:13, 50:4, 50:16
**2011** [1] - 49:12
**2016** [6] - 1:14, 3:1, 49:12, 49:17, 50:18, 53:10
**202** [1] - 1:23
**20250** [2] - 2:7, 2:11
**209** [2] - 44:13, 44:21
**21** [4] - 51:8, 51:10, 51:14, 51:20
**2453955** [1] - 44:9
**25** [2] - 1:14, 3:1
**2638** [1] - 2:3
**275,000** [1] - 33:20
**278.1** [1] - 12:12
**278.1(q** [3] - 12:4, 12:12, 12:13
**27th** [1] - 53:10
**28** [1] - 44:22
**280,000** [1] - 33:19

## 3

**3** [3] - 12:11, 13:6, 15:25
**300,000** [2] - 33:18

**320,000** [1] - 23:15
**330-6669** [1] - 53:16
**3311** [1] - 2:7
**35** [2] - 42:3, 42:5
**37** [1] - 44:13
**3:15** [1] - 3:2

## 4

**4** [32] - 3:13, 3:15, 9:9, 9:14, 10:11, 11:6, 11:17, 13:4, 15:20, 15:21, 15:22, 16:3, 17:5, 18:25, 23:9, 23:11, 26:14, 27:11, 27:18, 27:20, 28:20, 37:19, 38:2, 38:4, 39:12, 39:18, 44:19, 45:3, 46:24, 47:18
**400** [2] - 2:17, 53:15
**44** [1] - 44:21
**4:20** [1] - 52:5

## 5

**50** [1] - 35:7
**500** [1] - 33:23
**52** [1] - 53:6
**57101-2638** [1] - 2:4
**57104** [3] - 1:23, 2:17, 53:15

## 6

**6** [1] - 9:9
**605** [1] - 53:16

## 7

**7** [2] - 12:4, 12:12

## 8

**80** [1] - 25:4

## A

**abandon** [1] - 4:22
**able** [2] - 22:2, 32:13
**above-entitled** [1] - 53:6
**absence** [1] - 7:22
**absolute** [1] - 13:2
**absurd** [1] - 49:2
**access** [1] - 33:4
**accounting** [1] -

45:13
**accurate** [1] - 29:4
**achieve** [1] - 19:2
**achieved** [1] - 10:24
**acknowledged** [1] - 48:15
**acquisition** [2] - 21:14, 22:15
**across-the-nation** [1] - 36:21
**action** [1] - 53:9
**actual** [4] - 41:13, 46:2, 47:12, 47:24
**add** [2] - 32:20, 48:10
**added** [1] - 39:21
**adjourned** [1] - 52:4
**admitted** [1] - 48:16
**advantage** [1] - 24:16
**advisement** [2] - 27:9, 37:25
**affect** [1] - 23:18
**affected** [1] - 7:23
**affidavits** [2] - 5:24, 10:15
**affirmed** [1] - 10:14
**afford** [1] - 19:16
**afternoon** [1] - 3:5
**ag** [1] - 7:8
**Ag** [1] - 6:16
**age** [1] - 18:11
**Agency** [1] - 27:3
**agency** [6] - 10:13, 10:15, 10:18, 10:21, 11:7, 22:12
**aggregated** [1] - 48:5
**aggregation** [1] - 48:2
**Agnew** [1] - 33:9
**ago** [4] - 9:3, 12:16, 17:13, 31:8
**agree** [5] - 26:22, 40:12, 41:17, 41:20, 41:21
**agreed** [2] - 26:19, 32:9
**AGRICULTURE** [1] - 1:10
**Agriculture** [3] - 2:6, 2:10, 7:2
**ahead** [2] - 49:25, 50:8
**allegations** [1] - 11:1
**Alliance** [1] - 44:8
**allowed** [3] - 12:2, 12:5, 13:25
**allowing** [1] - 3:6
**almost** [2] - 38:24,

49:4
**alone** [1] - 25:7
**altogether** [1] - 44:7
**America** [3] - 29:13, 39:8, 39:9
**American** [1] - 24:14
**amount** [7] - 22:12, 22:19, 22:21, 36:15, 41:13, 42:7, 42:10
**amounts** [5] - 9:5, 9:20, 18:5, 40:8, 48:17
**analysis** [5] - 11:9, 17:3, 30:1, 37:19, 46:8
**annual** [1] - 47:25
**answer** [6] - 3:14, 14:16, 26:2, 27:14, 27:21, 31:4
**answered** [2] - 14:19, 39:14
**anyway** [3] - 18:13, 26:14, 28:16
**APPEARANCES** [2] - 1:21, 2:1
**appearing** [1] - 28:23
**applicant** [1] - 44:25
**applicants** [1] - 44:24
**applied** [1] - 41:4
**applies** [1] - 47:19
**apply** [4] - 23:15, 49:23, 50:7, 50:9
**approach** [5] - 15:23, 26:3, 33:1, 33:3, 43:11
**approached** [2] - 25:24, 26:4
**appropriate** [1] - 16:1
**approved** [1] - 40:6
**area** [1] - 8:6
**areas** [1] - 39:3
**argue** [3] - 5:16, 10:23, 27:22
**argued** [2] - 5:1, 11:17
**arguing** [7] - 4:8, 4:10, 4:11, 4:18, 4:23, 20:18, 50:3
**argument** [11] - 3:7, 4:12, 10:5, 13:8, 28:18, 28:19, 40:18, 41:9, 41:15, 43:19, 50:8
**ARGUS** [2] - 1:5, 1:6
**Argus** [8] - 3:12, 3:21, 7:6, 7:20, 12:7, 13:21, 16:22, 29:3
**Arneson** [3] - 1:22,

17:7, 43:4
**ARNESON** [28] - 17:8, 18:7, 18:11, 19:21, 21:24, 22:4, 22:23, 25:11, 25:18, 25:24, 35:15, 35:19, 36:12, 40:12, 40:25, 41:16, 42:20, 42:24, 43:5, 48:11, 50:1, 50:6, 50:9, 50:24, 51:12, 51:15, 51:19, 51:24
**arrow** [1] - 39:22
**article** [5] - 9:2, 9:19, 10:8, 17:23, 18:3
**aspect** [1] - 38:3
**assertion** [1] - 13:15
**association** [1] - 15:10
**associations** [3] - 15:7, 23:19, 23:22
**assume** [2] - 21:9, 23:6
**assumed** [1] - 25:14
**assumes** [2] - 34:10, 34:11
**assuming** [1] - 27:20
**attention** [2] - 19:15, 35:9
**attorney** [2] - 53:7, 53:8
**Attorney** [1] - 1:22
**Attorney's** [1] - 2:3
**available** [3] - 8:9, 8:17, 23:17
**Ave** [4] - 1:23, 2:7, 2:10, 2:17
**Avenue** [1] - 53:15
**average** [1] - 35:12
**award** [1] - 41:13
**aware** [1] - 37:10

## B

**bad** [2] - 11:2, 24:8
**balance** [1] - 38:9
**Bank** [1] - 44:23
**bank** [10] - 39:21, 39:23, 39:25, 40:1, 40:3, 45:19, 46:11, 48:21, 48:22
**base** [1] - 18:19
**based** [7] - 4:13, 4:15, 7:2, 11:10, 32:11, 40:5, 49:6
**basic** [2] - 18:14, 35:25
**basis** [1] - 48:6
**bearing** [1] - 49:8

**become** [1] - 34:8
**BEFORE** [1] - 1:18
**begin** [3] - 12:9, 17:9, 39:13
**beginning** [2] - 12:22, 26:20
**begins** [1] - 26:18
**behalf** [3] - 3:7, 29:1, 40:4
**belabor** [1] - 28:16
**belief** [2] - 12:2, 47:12
**believes** [2] - 44:14, 45:5
**beneficial** [1] - 31:3
**benefit** [2] - 19:1, 38:21
**benefits** [7] - 6:17, 14:9, 14:25, 15:1, 16:9, 38:10
**BENGFORD** [3] - 43:8, 51:3, 51:8
**Bengford** [1] - 2:2
**better** [2] - 38:15, 39:1
**beyond** [2] - 29:6, 30:6
**bid** [5] - 21:5, 22:20, 22:21, 41:10
**bidding** [2] - 22:3, 41:13
**bids** [1] - 41:9
**big** [3] - 24:8, 32:19, 39:6
**Bill** [1] - 6:23
**bill** [2] - 42:2, 42:5
**bills** [1] - 42:1
**black** [1] - 45:17
**Black's** [1] - 30:16
**blame** [1] - 31:17
**blink** [1] - 33:21
**blue** [1] - 19:25
**bother** [1] - 27:25
**bought** [1] - 45:15
**Box** [1] - 2:3
**box** [1] - 39:21
**bread** [1] - 42:3
**brief** [4] - 16:14, 51:4, 51:18
**briefs** [2] - 50:21, 52:3
**bring** [3] - 27:12, 49:4, 51:22
**burdens** [1] - 18:14
**business** [8] - 11:14, 16:20, 16:21, 26:23, 27:23, 35:24, 36:15, 37:1
**businessman** [1] - 29:10

**buy** [1] - 19:16
**buying** [1] - 29:18

## C

**C.F.R** [2] - 12:4, 12:12
**cannot** [5] - 7:25, 8:14, 14:15, 19:16, 38:16
**car** [1] - 41:1
**card** [1] - 46:4
**cards** [1] - 48:21
**care** [1] - 25:2
**careful** [1] - 13:23
**case** [44] - 4:21, 5:20, 8:1, 8:11, 8:15, 8:24, 9:10, 9:15, 9:16, 9:18, 9:22, 11:16, 12:7, 13:14, 13:25, 17:11, 18:15, 19:5, 23:7, 23:24, 26:4, 26:19, 27:11, 27:12, 27:18, 28:7, 28:20, 29:14, 37:6, 37:11, 37:14, 37:18, 39:12, 42:25, 43:16, 44:19, 47:15, 48:16, 49:13, 49:18, 49:20, 50:10, 53:6
**cases** [11] - 4:16, 5:7, 5:14, 6:3, 6:4, 8:14, 16:14, 21:22, 37:20, 43:8, 50:12
**catch** [1] - 23:1
**catch-all** [1] - 23:1
**categories** [1] - 23:3
**cents** [2] - 42:3, 42:6
**certain** [2] - 21:6, 23:2
**certainty** [1] - 12:23
**CERTIFICATE** [1] - 53:1
**Certified** [1] - 53:4
**certify** [2] - 53:5, 53:7
**chain** [2] - 40:22, 45:11
**change** [1] - 33:3
**changed** [1] - 17:22
**changes** [1] - 50:15
**charge** [2] - 12:21, 17:21
**charged** [1] - 10:21
**chart** [1] - 46:13
**charts** [1] - 19:8
**Chu** [1] - 2:9
**Chu-Yuan** [1] - 2:9
**Circuit** [8] - 4:1, 6:4,

6:5, 10:15, 12:7, 16:23, 17:1, 40:13
**circuit** [3] - 20:20, 28:2
**circuitous** [1] - 41:17
**cite** [1] - 8:24
**cited** [2] - 16:13, 49:18
**cites** [1] - 44:21
**citing** [2] - 9:1, 44:11
**Citizen** [2] - 44:11, 44:20
**Citizens** [1] - 44:8
**Civ** [1] - 1:4
**claiming** [2] - 15:19, 23:16
**clarify** [2] - 17:9, 44:7
**Clarke** [1] - 44:9
**class** [1] - 6:24
**classes** [1] - 15:1
**clear** [10] - 3:14, 8:5, 12:17, 16:5, 16:20, 19:6, 19:25, 23:20, 25:5, 48:19
**clearly** [2] - 21:16, 31:13
**client** [2] - 25:25, 26:5
**close** [1] - 27:7
**close-minded** [1] - 27:7
**closed** [5] - 20:20, 23:4, 28:2, 32:25, 35:18
**CLOSING** [2] - 1:8, 1:16
**closing** [1] - 3:7
**closings** [1] - 50:21
**clued** [1] - 41:1
**CMS** [1] - 17:22
**code** [1] - 47:9
**coincidence** [1] - 18:8
**Collegiate** [1] - 30:13
**comfortable** [1] - 50:24
**coming** [5] - 8:22, 9:23, 21:17, 26:24, 27:2
**comment** [1] - 25:13
**commenting** [1] - 24:11
**commerce** [1] - 10:4
**commercial** [2] - 3:16, 44:25
**commercial/ financial** [1] - 38:5
**common** [3] - 49:23, 50:7, 50:10

**company** [1] - 46:4
**compare** [1] - 32:16
**compared** [1] - 7:12
**comparison** [1] - 8:3
**compelling** [2] - 11:12, 16:18
**compete** [1] - 15:9
**competes** [3] - 15:12, 15:13
**competition** [22] - 6:8, 6:9, 11:15, 16:20, 22:21, 26:19, 26:21, 26:25, 29:8, 29:10, 29:13, 29:15, 29:17, 30:22, 32:21, 38:23, 39:1, 39:4, 39:8, 39:9
**competitive** [28] - 4:3, 4:5, 4:13, 4:15, 5:5, 6:12, 7:12, 7:17, 7:21, 8:3, 11:8, 17:1, 25:8, 26:16, 26:23, 28:22, 29:21, 31:5, 31:25, 34:22, 34:23, 38:7, 38:8, 38:21, 39:14, 41:12, 47:13, 50:15
**competitively** [1] - 7:4
**competitors** [2] - 5:12, 22:2
**complete** [2] - 7:22, 53:5
**completely** [1] - 43:19
**completing** [1] - 20:20
**component** [4] - 4:21, 4:22, 43:22, 43:24
**concealment** [1] - 23:24
**concede** [1] - 19:17
**concept** [2] - 31:1, 41:3
**conceptually** [1] - 41:19
**concern** [2] - 19:5, 29:11
**concerned** [2] - 8:19, 29:5
**concerns** [1] - 32:4
**conclude** [1] - 3:22
**conclusion** [4] - 31:7, 31:20, 31:22, 31:23
**confer** [1] - 14:10
**conferring** [1] - 14:14
**confident** [1] - 13:4
**confidential** [13] -

3:25, 4:2, 4:9, 4:13, 4:14, 4:19, 5:8, 8:24, 15:19, 16:21, 19:20, 41:11, 43:23
**confirm** [3] - 4:21, 8:14, 14:15
**confirmed** [1] - 4:1
**confuse** [1] - 20:13
**confused** [1] - 38:13
**confusing** [1] - 41:19
**congenial** [1] - 32:7
**Congress** [2] - 12:16, 28:5
**Congressional** [1] - 23:9
**Connelly** [4] - 2:16, 53:3, 53:12, 53:13
**consider** [4] - 24:21, 38:1, 39:12, 41:18
**considerable** [1] - 30:17
**consideration** [2] - 38:20, 49:11
**considered** [5] - 5:21, 6:7, 6:9, 13:7, 19:15
**consistent** [1] - 26:3
**consisting** [1] - 53:6
**construed** [1] - 15:5, 18:25
**contained** [1] - 44:1
**context** [2] - 28:9, 37:20
**continue** [2] - 26:12, 27:24
**Continued** [1] - 2:1
**contract** [11] - 21:1, 21:3, 21:6, 21:10, 21:12, 21:15, 22:1, 22:9, 22:16, 22:22, 28:10
**contracts** [1] - 23:5
**convince** [1] - 34:21
**core** [2] - 3:10, 47:15
**correct** [3] - 5:1, 12:8, 43:22
**correlation** [1] - 32:17
**counsel** [7] - 3:2, 3:6, 14:11, 14:14, 47:7, 53:7, 53:8
**Country** [1] - 44:8
**County** [1] - 21:11
**county** [1] - 47:10
**couple** [2] - 17:13, 30:20
**course** [2] - 13:25, 17:12
**COURT** [69] - 1:1, 1:16, 2:15, 3:3, 4:8,

4:17, 4:24, 5:2, 5:7, 6:14, 6:20, 7:5, 7:11, 8:6, 9:1, 9:18, 10:10, 11:16, 11:21, 12:25, 13:7, 14:7, 14:12, 14:17, 14:20, 15:16, 15:21, 16:2, 16:7, 16:12, 16:16, 17:7, 18:1, 18:10, 19:17, 21:22, 21:25, 22:19, 25:9, 25:12, 25:19, 36:10, 39:17, 40:23, 41:8, 42:18, 42:22, 43:4, 43:6, 43:12, 43:23, 46:3, 46:10, 46:16, 46:21, 46:23, 47:16, 48:9, 49:23, 50:3, 50:7, 50:20, 51:6, 51:10, 51:14, 51:17, 51:20, 52:2, 53:1

**court** [1] - 3:2
**Court** [34] - 1:18, 3:6, 5:22, 10:18, 12:16, 13:7, 13:12, 13:16, 15:15, 17:4, 17:14, 17:19, 17:25, 18:8, 18:15, 23:12, 27:17, 29:14, 29:24, 30:4, 37:9, 37:24, 37:25, 38:15, 39:11, 43:14, 44:5, 48:23, 49:5, 49:9, 51:5, 53:4, 53:14
**Court's** [1] - 51:24
**Courthouse** [3] - 1:13, 2:16, 53:14
**courtroom** [2] - 35:11, 35:18
**Courts** [1] - 28:6
**cover** [1] - 17:24
**create** [4] - 7:25, 8:2, 37:17, 40:19
**creating** [1] - 30:5
**credit** [2] - 46:4, 48:21
**critical** [2] - 20:19, 37:5
**CRR** [2] - 2:16, 53:13
**Cumberland** [2] - 32:23, 36:5
**cut** [2] - 19:11, 45:10

# D

**D.C** [1] - 6:5
**daily** [1] - 48:6
**DAKOTA** [2] - 1:2, 53:1

**Dakota** [3] - 6:18, 7:8, 23:2
**data** [15] - 3:21, 4:5, 6:7, 11:9, 11:20, 13:11, 13:17, 14:7, 14:8, 35:11, 45:9, 47:25, 48:3, 48:6, 50:4
**dates** [1] - 30:15
**David** [1] - 2:6
**days** [9] - 3:9, 3:14, 30:21, 50:16, 51:8, 51:10, 51:14, 51:20, 51:21
**dba** [1] - 1:6
**DC** [2] - 2:7, 2:11
**DEA** [1] - 5:20
**deal** [4] - 21:12, 27:20, 28:24, 29:21
**dealing** [1] - 5:8
**dealt** [1] - 5:9
**decided** [3] - 22:5, 29:15, 33:2
**decision** [17] - 3:25, 4:4, 5:4, 5:17, 5:24, 7:3, 10:13, 10:17, 11:1, 12:6, 17:25, 18:8, 29:24, 40:14, 49:6
**decisions** [3] - 11:9, 13:13, 50:18
**decisis** [1] - 37:13
**declaration** [3] - 5:20, 5:25, 23:23
**Defendant** [2] - 1:11, 2:12
**defense** [4] - 11:12, 16:17, 31:13, 31:17
**defenses** [1] - 34:11
**defined** [4] - 3:19, 30:7, 30:11, 30:17
**definition** [1] - 29:23
**definitions** [2] - 29:25, 30:10
**definitive** [1] - 31:4
**delineate** [1] - 47:21
**demarcation** [1] - 33:16
**DEPARTMENT** [1] - 1:9
**Department** [4] - 2:6, 2:10, 6:16, 7:2
**dependent** [1] - 42:11
**describe** [2] - 9:24, 10:4
**described** [3] - 8:22, 9:17, 48:13
**deserved** [1] - 27:17
**deserves** [1] - 24:14

**designed** [1] - 23:10
**desired** [1] - 18:22
**despite** [1] - 19:8
**determination** [1] - 10:20
**determine** [1] - 19:19
**detrimental** [1] - 31:2
**developed** [2] - 37:11, 37:15
**Dictionary** [2] - 30:14, 30:16
**different** [8] - 10:5, 12:10, 13:24, 14:1, 21:21, 22:4, 25:10, 33:3
**diminish** [1] - 48:22
**dinner** [1] - 45:15
**direction** [1] - 25:10
**directly** [3] - 13:16, 40:20, 47:4
**disagree** [1] - 8:11
**disclosed** [2] - 17:16, 27:4
**disclosure** [4] - 15:24, 16:24, 24:6
**discuss** [2] - 10:9, 47:5
**discussed** [1] - 25:25
**discussing** [1] - 44:8
**discussion** [3] - 14:13, 23:7, 44:4
**dispensed** [1] - 31:8
**dispositive** [1] - 50:17
**dispute** [1] - 31:10
**dissuaded** [1] - 30:2
**distinguish** [1] - 6:2
**distinguishment** [1] - 15:4
**distracts** [1] - 38:19
**DISTRICT** [4] - 1:1, 1:2, 53:1, 53:1
**District** [4] - 1:13, 1:18, 17:14, 53:4
**diverse** [2] - 11:13, 16:18
**DIVISION** [2] - 1:3, 53:2
**divulge** [1] - 28:13
**doctors** [1] - 10:3
**doctors'** [1] - 9:12
**document** [2] - 44:10, 46:3
**documents** [1] - 31:11
**dollar** [1] - 9:5
**dollars** [1] - 20:8
**done** [1] - 7:17

**door** [1] - 14:1
**doubt** [2] - 19:2, 23:24
**doubts** [1] - 31:23
**down** [2] - 18:21, 28:21
**Dr** [1] - 30:25
**drafting** [1] - 44:10
**driving** [1] - 39:4

# E

**E-mail** [1] - 53:16
**earning** [1] - 22:5
**EBT** [17] - 20:10, 39:21, 39:23, 39:25, 40:3, 44:4, 45:6, 45:10, 45:12, 46:11, 46:14, 46:19, 48:3, 48:4, 48:5
**EBTs** [2] - 19:8, 48:21
**edition** [1] - 30:14
**effect** [1] - 18:23
**effectively** [1] - 30:24
**effects** [1] - 23:16
**Eighth** [7] - 4:1, 6:4, 10:15, 12:6, 16:23, 17:1, 40:13
**either** [2] - 41:20, 50:20
**Either** [1] - 43:12
**element** [1] - 8:4
**eliminates** [1] - 6:12
**Ellis** [7] - 21:9, 21:13, 22:7, 22:9, 22:13, 28:4, 28:12
**elsewhere** [1] - 49:19
**employee** [3] - 18:22, 53:7, 53:8
**employees** [1] - 42:23
**End** [1] - 52:5
**end** [3] - 8:21, 18:24, 30:25
**ended** [3] - 21:8, 24:25, 25:4
**enforce** [1] - 45:24
**engage** [2] - 11:7, 21:1
**enters** [1] - 22:16
**entire** [3] - 15:1, 45:11, 48:7
**entities** [4] - 9:4, 10:3, 10:7, 45:2
**entitled** [1] - 53:6
**entity** [3] - 9:8, 46:5,

47:1
**entry** [1] - 38:25
**envelope** [1] - 45:17
**equal** [1] - 23:17
**equally** [1] - 23:16
**equation** [2] - 21:21, 27:5
**escapes** [1] - 11:25
**especially** [2] - 15:5, 26:6
**essentially** [1] - 19:2
**establish** [1] - 19:7
**established** [2] - 30:24, 33:14
**establishing** [1] - 25:7
**events** [1] - 53:9
**everyday** [1] - 50:15
**evidence** [5] - 29:7, 49:22, 50:2, 50:4, 50:6
**exact** [2] - 9:16, 36:16
**exactly** [7] - 10:2, 10:9, 27:22, 33:14, 34:9, 34:13, 47:17
**example** [6] - 20:15, 22:7, 28:4, 28:12, 44:5, 45:14
**excuse** [1] - 5:24
**executes** [1] - 45:18
**executive** [1] - 31:12
**exempt** [1] - 25:15
**exemption** [3] - 9:7, 13:11, 41:14
**Exemption** [35] - 3:13, 3:15, 9:9, 9:14, 10:11, 11:6, 11:17, 12:11, 13:4, 13:6, 15:20, 15:21, 15:22, 15:25, 16:3, 17:5, 23:9, 23:11, 26:14, 27:11, 27:18, 27:20, 28:20, 37:19, 38:2, 38:4, 39:12, 39:18, 44:19, 45:3, 46:24, 47:18
**exemptions** [1] - 18:24
**Exhibit** [1] - 39:20
**exhibit** [1] - 40:25
**existence** [1] - 20:22
**expanding** [1] - 38:23
**expecting** [1] - 33:15
**experience** [1] - 8:18
**expert** [3] - 7:14, 7:16, 7:19
**expertise** [1] - 31:18
**experts** [1] - 26:22

**explicitly** [1] - 7:1
**exploring** [1] - 9:6
**expressive** [1] -
10:12
**extraneous** [1] -
35:23
**extrapolating** [1] -
32:12

# F

**F.Supp.2d** [3] -
44:13, 44:21, 44:22
**faced** [1] - 24:17
**facilitates** [2] -
20:11, 41:22
**fact** [12] - 4:4, 5:23,
6:23, 19:9, 19:10,
25:13, 27:2, 29:15,
40:21, 47:5, 48:23
**factors** [1] - 11:10
**facts** [2] - 11:8,
37:16
**fairly** [1] - 36:14,
41:3
**faith** [1] - 11:2
**fall** [4] - 26:13, 41:14,
44:18, 46:24
**Falls** [6] - 1:14, 1:19,
1:23, 2:4, 2:17, 53:15
**family** [1] - 8:19
**Farm** [1] - 6:23
**farm** [1] - 7:14
**farmers** [1] - 6:17
**farms** [2] - 7:16, 7:18
**fault** [1] - 38:14
**favor** [1] - 23:23
**favorite** [1] - 33:8
**Federal** [3] - 15:2,
18:22, 22:24
**felt** [1] - 13:4
**few** [4] - 12:16,
17:12, 25:4, 43:8
**field** [2] - 26:23,
50:15
**fight** [1] - 34:11
**figure** [1] - 47:17
**figures** [1] - 11:8
**filings** [1] - 17:3
**final** [2] - 39:16,
40:22
**finally** [3] - 17:19,
19:7, 34:25
**financial** [3] - 3:16,
19:18, 27:22
**fine** [1] - 35:2
**first** [16] - 3:16, 6:3,
12:25, 13:2, 16:5,
19:4, 24:23, 26:7,

28:19, 36:15, 36:24,
37:6, 38:13, 43:15,
47:3, 48:13
**fit** [2] - 23:9, 49:7
**fits** [1] - 47:17
**five** [2] - 18:3, 51:21
**flexible** [1] - 31:1
**Florida** [7] - 8:25,
17:14, 17:15, 18:2,
18:4, 18:8, 18:9
**flow** [3] - 19:8, 45:11,
48:7
**flows** [1] - 10:3
**FMI** [2] - 24:5
**FNS** [2] - 45:13,
45:25
**focused** [2] - 32:5,
43:20
**focusing** [1] - 4:12
**FOIA** [11] - 3:13,
3:15, 13:4, 13:6,
16:23, 17:5, 18:20,
19:3, 22:25, 26:7,
47:24
**follow** [1] - 47:14
**Food** [1] - 23:22
**food** [3] - 19:13,
19:16, 21:4
**forced** [1] - 38:13
**forcing** [1] - 33:1
**foregoing** [1] - 53:5
**foremost** [1] - 19:5
**forgot** [1] - 48:11
**forgotten** [1] - 47:7
**form** [1] - 14:5
**Forman** [3] - 32:10,
32:14, 35:9
**forth** [2] - 9:25, 13:19
**forward** [1] - 25:21
**four** [5] - 5:17, 18:3,
32:25, 35:6, 36:11
**fourth** [1] - 38:1
**frankly** [1] - 22:7
**free** [1] - 38:24
**friend** [1] - 45:15
**front** [3] - 8:14, 9:15,
17:11
**fulfill** [1] - 19:2
**full** [1] - 53:5
**fully** [2] - 9:16, 14:19
**functioning** [1] -
20:22
**fundamental** [1] -
3:10
**future** [3] - 21:13,
22:3, 49:8

# G

**Gaston** [5] - 2:6, 3:3,
21:23, 43:6, 43:9
**GASTON** [42] - 3:5,
4:10, 4:20, 4:25, 5:3,
5:16, 6:19, 6:21, 7:10,
7:14, 8:10, 9:6, 9:22,
10:11, 11:19, 11:24,
13:2, 13:10, 14:10,
14:14, 14:18, 15:3,
15:20, 15:22, 16:3,
16:10, 16:13, 16:17,
35:14, 35:17, 43:10,
43:13, 43:25, 46:7,
46:13, 46:18, 46:22,
47:2, 47:21, 49:21,
51:2, 52:1
**general** [2] - 14:8,
26:6
**generalized** [1] -
11:1
**generally** [2] - 36:23,
39:1
**generated** [2] - 40:9,
44:2
**generates** [1] - 32:18
**genesis** [1] - 10:1
**geospatial** [1] - 6:25
**GIS** [1] - 6:25
**given** [3] - 19:1,
24:18, 38:21
**God** [1] - 49:11
**goodness** [1] - 36:19
**goods** [1] - 45:1
**Government** [66] -
3:8, 3:23, 5:9, 6:1,
6:15, 14:23, 18:21,
19:9, 19:12, 19:24,
20:5, 20:7, 20:12,
20:18, 21:1, 21:3,
21:6, 21:11, 21:17,
22:6, 22:10, 22:13,
22:17, 22:22, 22:24,
23:5, 23:8, 26:8,
27:19, 28:9, 28:10,
29:2, 31:7, 32:9, 37:8,
37:20, 39:21, 39:22,
39:25, 40:2, 40:10,
40:16, 40:21, 42:1,
42:3, 42:23, 44:1,
44:14, 44:18, 45:5,
45:8, 45:10, 46:3,
46:11, 46:14, 46:17,
46:18, 46:20, 47:1,
47:19, 48:14, 48:18,
48:24, 48:25, 49:1
**Government's** [2] -
29:7, 40:15

**grant** [1] - 21:18
**granular** [1] - 47:12
**great** [4] - 30:18,
33:7, 34:1, 34:22
**greater** [1] - 29:18
**grocery** [5] - 14:25,
26:23, 36:25, 41:25,
46:6
**Group** [1] - 44:20
**group** [5] - 14:8,
15:4, 15:5, 15:11,
34:2
**grouping** [1] - 6:11
**groupings** [1] - 15:8
**groups** [3] - 14:23,
15:18, 16:8
**guess** [8] - 9:22,
20:3, 28:11, 30:9,
31:9, 35:22, 36:5,
41:2
**guy** [3] - 21:2, 21:9,
24:8
**Gwen** [1] - 32:10

# H

**half** [1] - 28:9
**hand** [1] - 53:10
**handouts** [1] - 20:1
**harm** [29] - 4:3, 4:5,
4:14, 4:15, 5:5, 6:12,
7:12, 8:4, 11:8, 17:1,
25:8, 26:16, 26:24,
27:1, 28:22, 29:22,
30:8, 31:6, 31:25,
34:22, 34:23, 35:21,
35:22, 38:7, 38:8,
38:21, 39:14, 41:12,
47:13
**harmful** [2] - 7:4,
32:19
**harms** [1] - 35:23
**harsh** [1] - 26:10
**Hays** [1] - 32:6
**head** [1] - 38:16
**Health** [3] - 44:11,
44:12, 44:20
**hear** [2] - 34:25, 35:3
**heard** [7] - 29:12,
30:20, 34:20, 34:24,
36:22, 39:6, 50:16
**heaven** [1] - 50:14
**held** [1] - 9:7
**helicopters** [1] - 21:2
**help** [3] - 17:9, 44:7,
45:24
**helpful** [2] - 29:25,
32:18
**hereby** [1] - 53:4

**hereto** [2] - 53:8,
53:10
**herself** [1] - 6:1
**hesitate** [1] - 49:4
**High** [1] - 44:8
**high** [4] - 30:11,
30:18, 33:13, 35:7
**higher** [1] - 18:5
**highest** [1] - 18:9
**highly** [2] - 30:7,
50:14
**himself** [1] - 28:13
**hit** [1] - 23:12
**hold** [1] - 18:17
**holds** [1] - 47:11
**honest** [1] - 26:2
**honestly** [2] - 34:10,
38:18
**Honor** [31] - 4:20,
4:25, 5:16, 6:21, 8:10,
10:8, 11:10, 11:12,
12:8, 12:15, 16:6,
16:11, 16:25, 17:6,
17:8, 43:10, 43:15,
43:18, 43:21, 45:4,
45:14, 46:1, 47:14,
48:12, 49:3, 49:21,
50:24, 51:2, 51:3,
51:9, 52:1
**Honorable** [1] - 1:18
**hoping** [1] - 49:5
**hospital** [1] - 10:4
**HSH** [1] - 17:22
**huge** [1] - 36:16
**hundred** [2] - 5:18,
25:2
**Hwang** [1] - 2:9

# I

**idea** [2] - 24:7, 35:25
**identified** [2] - 9:3,
25:6
**identify** [2] - 31:13,
32:16
**identifying** [1] -
48:24
**ignored** [1] - 47:6
**illogical** [1] - 31:21
**impact** [3] - 5:11,
37:1, 41:11
**impacted** [1] - 34:2
**important** [1] - 37:17
**imposed** [1] - 28:6
**impression** [2] -
32:6, 33:17
**IN** [1] - 53:10
**inappropriate** [1] -
16:4

**included** [1] - 5:17
**indeed** [1] - 44:15
**Independence** [2] - 2:7, 2:10
**independent** [2] - 15:6, 20:21
**indicating** [1] - 40:4
**indicative** [1] - 31:18
**individual** [10] - 6:6, 6:10, 6:12, 6:17, 9:12, 10:6, 14:21, 15:4, 15:8, 47:12
**individual's** [1] - 13:22
**individuals** [2] - 6:8, 15:6
**indulgence** [1] - 51:25
**industry** [1] - 21:5
**inept** [1] - 19:6
**information** [108] - 3:11, 3:16, 3:21, 3:22, 3:24, 5:9, 5:11, 5:12, 5:15, 5:21, 6:13, 6:20, 6:22, 6:24, 6:25, 7:1, 7:3, 7:5, 7:19, 7:21, 7:22, 7:24, 8:2, 8:4, 8:9, 8:16, 8:23, 9:7, 9:12, 9:23, 10:2, 10:3, 10:6, 11:2, 11:18, 12:1, 12:4, 12:14, 13:3, 13:5, 13:20, 13:22, 14:4, 14:22, 15:19, 15:23, 16:21, 17:16, 19:18, 19:23, 20:4, 20:11, 20:19, 20:21, 20:24, 21:16, 22:1, 22:14, 22:22, 23:3, 23:17, 24:16, 24:20, 24:23, 25:17, 25:20, 26:17, 27:3, 27:23, 28:3, 28:5, 28:13, 30:22, 31:24, 32:11, 33:5, 33:16, 35:10, 37:22, 39:19, 40:2, 40:7, 40:9, 40:19, 41:5, 41:10, 41:21, 41:22, 42:12, 43:15, 44:1, 44:3, 44:15, 44:17, 44:24, 45:5, 45:11, 47:6, 47:7, 47:22, 47:23, 48:4, 49:7, 49:14, 49:15, 50:13
**informed** [4] - 8:1, 10:19, 10:23, 43:20
**ingoing** [1] - 42:12
**injunction** [1] - 17:14
**injured** [1] - 21:20
**inquiry** [1] - 26:18

**inside** [1] - 45:16
**instance** [8] - 6:10, 6:16, 7:7, 9:8, 13:19, 13:21, 22:20, 25:20
**instinct** [2] - 24:17, 24:24
**Institute** [1] - 23:23
**Institutes** [1] - 44:12
**insurance** [1] - 44:24
**intended** [3] - 28:11, 28:12, 29:4
**intending** [1] - 28:6
**intent** [1] - 23:10
**intentioned** [1] - 32:7
**intentions** [2] - 21:14, 22:15
**interest** [1] - 53:8
**interested** [3] - 24:1, 37:4, 43:21
**interesting** [3] - 5:23, 33:12, 33:13
**intuitively** [1] - 31:16
**inventory** [1] - 4:7, 5:6
**involved** [2] - 5:18, 28:15
**isolating** [1] - 20:25
**issue** [14] - 8:20, 8:21, 11:21, 16:15, 19:19, 20:13, 27:12, 28:22, 33:25, 45:1, 49:7, 49:10, 51:4, 51:16
**issues** [1] - 3:10
**items** [1] - 20:17
**itself** [4] - 12:19, 20:23, 38:11, 49:6

## J

**January** [1] - 12:8
**Jill** [4] - 2:16, 53:3, 53:12, 53:13
**Jill_Connelly@sdd. uscourts.gov** [2] - 2:18, 53:16
**Joe** [2] - 42:2, 42:6
**Jon** [1] - 1:22
**Judge** [2] - 1:18, 42:15
**Judges** [1] - 37:12
**judgment** [1] - 50:23
**Judicial** [1] - 44:21
**jump** [1] - 28:21
**June** [1] - 53:10
**justification** [1] - 10:16
**justifies** [1] - 20:2

## K

**Karen** [1] - 1:18
**keep** [7] - 12:14, 14:22, 37:5, 45:21, 45:22, 45:24, 49:1
**keeps** [3] - 3:20, 27:14, 48:16
**kept** [4] - 14:6, 43:16, 47:23, 47:24
**key** [1] - 38:12
**kind** [7] - 20:24, 21:16, 23:5, 24:7, 28:5, 37:6, 41:8
**kiosks** [1] - 36:13
**knowledge** [2] - 6:21, 32:11
**knowledgeable** [2] - 11:13, 16:19
**known** [1] - 6:25
**knows** [4] - 34:15, 48:14, 49:11, 50:14

## L

**land** [2] - 21:13, 22:14
**language** [5] - 12:18, 12:22, 39:17, 42:9, 44:23
**large** [1] - 15:18
**larger** [1] - 9:8
**Larkin** [1] - 25:18
**last** [8] - 3:9, 3:13, 3:25, 17:12, 30:20, 34:25, 39:15, 50:16
**Law** [1] - 1:22, 30:16
**law** [16] - 3:19, 4:21, 8:11, 12:12, 12:20, 12:21, 27:13, 28:7, 37:11, 37:14, 47:13, 47:14, 47:17, 49:18, 50:10
**lead** [2] - 29:17, 29:18
**Leader** [3] - 7:6, 12:7, 29:3
**LEADER** [2] - 1:5, 1:6
**least** [1] - 38:1, 51:4
**leave** [1] - 35:10
**legal** [4] - 3:11, 3:12, 18:14, 28:23
**legitimate** [4] - 27:8, 27:12, 30:3, 32:4
**lenders** [1] - 44:25
**level** [2] - 18:22, 47:12

**levels** [3] - 4:7, 5:6, 33:11
**liberal** [1] - 41:3
**lifted** [2] - 17:16, 17:17
**light** [1] - 12:10
**likelihood** [4] - 25:8, 26:15, 29:21, 39:13
**likely** [11] - 16:24, 16:25, 26:15, 29:23, 30:6, 30:11, 31:5, 31:25, 34:23, 38:6, 38:7
**limit** [1] - 11:22
**limiting** [1] - 49:6, 51:15
**line** [2] - 33:15, 37:15
**list** [1] - 24:3
**listed** [5] - 4:6, 7:6, 9:19, 18:24, 24:2
**litigating** [1] - 49:13
**logic** [2] - 31:20, 31:23
**logical** [2] - 29:9, 31:6
**logically** [1] - 28:23
**longstanding** [2] - 15:24, 17:14
**look** [6] - 4:21, 13:15, 14:16, 16:10, 39:20, 43:17
**looked** [5] - 5:8, 5:20, 6:3, 6:4, 13:3
**looking** [7] - 12:9, 16:2, 24:22, 27:14, 33:11, 36:9, 46:8
**love** [2] - 19:21, 29:14
**low** [6] - 33:12, 35:12, 35:19, 35:20, 36:22, 36:25
**lower** [1] - 29:17
**lowest** [1] - 18:22
**lump** [1] - 15:17

## M

**Madel** [7] - 3:25, 4:4, 5:3, 5:4, 5:17, 5:24, 10:18
**mail** [1] - 53:16
**Main** [1] - 1:23
**majority** [2] - 10:22, 33:8
**manage** [1] - 45:25
**manipulation** [1] - 48:2
**margin** [1] - 36:25
**Market** [1] - 23:22

**market** [2] - 4:6, 5:5
**marketplace** [1] - 7:23
**Mart** [1] - 32:22
**match** [1] - 23:10
**material** [1] - 50:17
**Matt** [1] - 40:23
**matter** [6] - 8:5, 11:4, 12:9, 20:11, 47:23, 49:5
**MAY** [1] - 3:1
**mean** [19] - 11:22, 19:24, 19:25, 23:2, 24:12, 26:10, 27:22, 27:25, 28:6, 29:10, 30:5, 30:7, 30:25, 34:3, 34:4, 36:7, 42:15, 48:18, 50:1
**meaning** [1] - 45:2
**means** [2] - 26:24, 36:22
**Media** [1] - 12:7
**media** [1] - 33:25
**MEDIA** [1] - 1:5
**Medicaid** [2] - 8:8, 9:4
**medical** [2] - 8:7, 17:10
**Medicare** [13] - 8:8, 8:15, 8:16, 9:4, 9:11, 13:14, 14:7, 14:9, 14:24, 16:9, 17:10, 17:15, 17:21
**meet** [1] - 3:12
**member** [2] - 23:21, 24:5
**mention** [1] - 35:15
**mentioned** [2] - 5:5, 13:14
**mentions** [1] - 18:18
**Merit** [1] - 53:4
**Merriam** [2] - 30:2, 30:13
**Merriam-Webster** [1] - 30:2
**Merriam-Webster's** [1] - 30:13
**met** [3] - 11:3, 11:5, 17:4
**metrics** [1] - 14:4
**middle** [1] - 34:1
**middle-of-the-road** [1] - 34:1
**might** [12] - 6:13, 7:17, 10:13, 12:24, 17:23, 31:19, 32:20, 35:24, 39:3, 44:5, 45:14, 49:7
**mind** [1] - 37:6
**minded** [1] - 27:7

**minimal** [1] - 50:5
**minimize** [2] - 29:1, 29:2
**minimizes** [1] - 37:1
**Minnehaha** [1] - 21:10
**minority** [1] - 10:23
**minute** [1] - 25:10
**Miss** [1] - 35:9
**missing** [1] - 33:6
**mission** [1] - 38:19
**mistake** [1] - 26:8
**moment** [4] - 3:7, 4:20, 14:10, 51:2
**money** [5] - 24:15, 39:24, 40:4, 46:11, 46:19
**most** [7] - 6:23, 24:22, 28:23, 32:5, 35:22, 42:20, 43:21
**motions** [1] - 50:23
**move** [1] - 36:3
**MR** [69] - 3:5, 4:10, 4:20, 4:25, 5:3, 5:16, 6:19, 6:21, 7:10, 7:14, 8:10, 9:6, 9:22, 10:11, 11:19, 11:24, 13:2, 13:10, 14:10, 14:14, 14:18, 15:3, 15:20, 15:22, 16:3, 16:10, 16:13, 16:17, 17:8, 18:7, 18:11, 19:21, 21:24, 22:4, 22:23, 25:11, 25:18, 25:24, 35:14, 35:17, 35:19, 36:12, 40:12, 40:25, 41:16, 42:20, 42:24, 43:5, 43:10, 43:13, 43:25, 46:7, 46:13, 46:18, 46:22, 47:2, 47:21, 48:11, 49:21, 50:1, 50:6, 50:9, 50:24, 51:2, 51:12, 51:15, 51:19, 51:24, 52:1
**MS** [3] - 43:8, 51:3, 51:8
**must** [5] - 4:1, 10:12, 11:7, 32:9, 33:7

**N**

**names** [1] - 9:20
**narrative** [1] - 16:18
**narratives** [1] - 11:13
**narrow** [1] - 4:18
**narrowly** [1] - 18:25
**nation** [1] - 36:21
**National** [1] - 44:12

**nationwide** [1] - 18:6
**natural** [1] - 24:17
**nature** [5] - 7:15, 7:18, 7:21, 9:16, 16:21
**nebulous** [1] - 32:19
**necessarily** [2] - 25:6, 28:1
**necessary** [1] - 32:1
**need** [5] - 18:19, 19:14, 30:4, 36:17, 51:7
**needed** [1] - 31:9
**needs** [1] - 35:10
**neighbor** [1] - 15:13
**neighborhood** [1] - 21:7
**never** [5] - 5:1, 29:6, 30:23, 33:10, 41:3
**new** [1] - 15:23
**newspaper** [1] - 9:19
**nexus** [1] - 14:5
**nice** [1] - 36:8
**nine** [1] - 18:24
**nobody** [7] - 25:24, 30:2, 30:25, 32:23, 33:1, 33:13, 34:3
**nongovernmental** [1] - 44:3
**normal** [1] - 33:22
**normally** [1] - 21:25
**Northeast** [1] - 36:8
**notable** [1] - 12:15
**Notary** [1] - 53:4
**notes** [1] - 45:21
**nothing** [4] - 37:22, 37:23, 42:7, 48:8
**Notice** [1] - 31:14
**number** [3] - 9:2, 35:19, 40:5
**numbers** [3] - 33:20, 34:24, 36:22
**nutritious** [1] - 19:16

**O**

**object** [1] - 35:1
**objection** [2] - 49:21, 49:24
**Objection** [1] - 35:14
**objective** [2] - 11:7, 34:5
**obtained** [17] - 19:18, 19:22, 21:17, 27:24, 28:8, 28:17, 38:6, 39:19, 40:11, 40:17, 41:2, 42:6, 44:2, 44:24, 46:24, 46:25, 47:20

**obtaining** [1] - 20:19
**obvious** [2] - 23:1, 31:16
**obviously** [2] - 32:8, 34:1
**occurring** [1] - 30:12
**OF** [5] - 1:2, 1:10, 1:16, 53:1
**offer** [4] - 14:16, 25:25, 37:10, 44:5
**offered** [2] - 11:12, 16:18
**offers** [1] - 3:14
**Office** [1] - 2:3
**Official** [1] - 53:3
**official** [2] - 5:20, 6:1
**old** [2] - 12:21, 30:15
**older** [1] - 18:11
**once** [2] - 29:6, 39:6
**one** [30] - 3:21, 4:22, 5:10, 5:13, 5:18, 6:24, 8:3, 8:13, 15:12, 15:13, 16:13, 18:12, 18:16, 21:25, 22:8, 23:13, 23:21, 24:2, 25:12, 34:3, 36:5, 38:3, 39:16, 45:18, 45:20, 48:11
**one-for-one** [1] - 8:3
**ones** [1] - 21:22
**open** [5] - 3:2, 21:8, 23:3, 23:5, 28:2
**open-ended** [1] - 21:8
**operation** [1] - 36:7
**opinion** [1] - 52:2
**opinions** [1] - 35:3
**opportunities** [1] - 33:4
**opposite** [1] - 34:9
**option** [3] - 24:18, 25:21
**order** [1] - 31:12
**organization** [1] - 15:10
**origin** [1] - 40:19
**original** [1] - 19:23
**originates** [1] - 3:22
**otherwise** [1] - 37:13
**outcome** [2] - 9:24, 53:8
**outfit** [1] - 32:21
**outside** [4] - 20:22, 44:18, 49:21, 50:2
**overall** [2] - 32:17, 36:21
**overruled** [1] - 49:24
**overstretch** [1] - 17:18
**owe** [1] - 42:3

**own** [5] - 10:20, 12:3, 31:12, 32:10, 32:11
**owner** [1] - 42:1
**owns** [1] - 32:15

**P**

**p.m** [2] - 3:2, 52:5
**page** [1] - 46:9
**Pages** [1] - 53:6
**paid** [6] - 40:8, 42:3, 42:8, 42:11, 42:13, 42:16
**parallel** [1] - 13:13
**pardon** [1] - 43:17
**part** [4] - 11:11, 21:12, 44:16, 48:7
**participate** [4] - 19:13, 21:7, 22:6, 25:22
**participating** [4] - 20:8, 27:18, 37:21, 40:9
**participation** [3] - 23:8, 37:7, 48:18
**particular** [13] - 5:18, 6:10, 8:4, 8:5, 8:12, 13:10, 13:11, 16:15, 26:21, 38:4, 44:10, 47:2, 47:23
**parties** [4] - 5:18, 5:19, 53:7
**party** [5] - 5:10, 5:13, 21:18, 21:19, 31:19
**pass** [1] - 16:5
**passed** [1] - 50:11
**past** [1] - 49:8
**Paul** [1] - 38:14
**pay** [6] - 19:24, 20:17, 22:11, 45:19, 46:11, 46:14
**paying** [6] - 19:12, 20:2, 20:5, 20:7, 40:17, 46:4
**payment** [12] - 14:24, 15:2, 41:18, 41:21, 41:23, 46:2, 47:5, 48:7, 48:24, 48:25, 49:14
**payments** [6] - 9:4, 14:9, 17:10, 18:4, 25:14, 49:2
**pays** [2] - 6:16, 22:17
**people** [27] - 7:7, 9:3, 14:23, 15:1, 15:18, 19:14, 20:8, 20:25, 21:5, 23:14, 23:15, 24:17, 25:2, 25:5, 26:9, 26:21, 26:22,

29:8, 29:12, 32:4, 34:12, 35:3, 35:25, 36:2, 49:16
**percent** [2] - 5:18, 35:13
**percentage** [3] - 35:20, 36:17, 36:21
**percentages** [1] - 36:18
**perhaps** [5] - 9:11, 10:4, 22:15, 33:13, 38:22
**period** [2] - 11:22, 11:23
**person** [27] - 3:18, 18:17, 19:19, 19:22, 21:17, 21:20, 21:25, 22:16, 23:13, 27:24, 28:8, 28:17, 38:6, 39:19, 40:11, 41:3, 41:9, 41:13, 42:11, 43:22, 44:2, 44:15, 45:2, 46:17, 46:25, 47:20, 51:4
**personal** [2] - 24:20, 45:22
**personally** [1] - 30:1
**pertains** [1] - 21:20
**Phillips** [2] - 2:17, 53:15
**Phone** [1] - 53:16
**phrase** [1] - 49:15
**physician** [2] - 8:17, 10:6
**physicians** [4] - 8:7, 8:19, 14:24, 16:8
**Pick** [1] - 20:16
**picture** [2] - 32:19, 39:6
**place** [4] - 18:12, 26:7, 36:24, 38:13
**Plaintiff** [3] - 1:7, 1:24, 3:17
**plans** [2] - 36:16, 49:16
**plenty** [1] - 50:12
**plurality** [1] - 10:22
**plus** [1] - 24:10
**PO** [1] - 2:3
**pocket** [1] - 45:22
**podium** [1] - 43:11
**point** [11] - 20:3, 24:10, 25:21, 29:6, 32:18, 37:15, 40:15, 40:18, 40:22, 43:17, 50:5
**policy** [3] - 11:7, 11:10, 17:22
**population** [1] - 18:9
**position** [3] - 7:18,

32:15, 41:12
**possible** [1] - 34:20
**possibly** [1] - 49:16
**potential** [2] - 35:21, 38:10
**potentially** [1] - 27:2
**power** [1] - 29:18
**preamble** [1] - 12:18
**precedent** [1] - 37:13
**precluded** [1] - 11:17
**predators** [2] - 24:4, 34:8
**predominates** [1] - 28:19
**prefer** [1] - 35:17
**prepared** [1] - 16:15
**present** [3] - 3:2, 29:4, 49:8
**presentation** [1] - 19:6
**presented** [1] - 29:1
**President** [2] - 18:21, 33:8
**pressure** [1] - 17:19
**presumptions** [1] - 18:15
**pretrial** [4] - 30:10, 37:10, 49:19, 50:22
**pretty** [8] - 19:6, 23:20, 23:22, 30:18, 32:19, 33:22, 36:7, 36:22
**prevents** [1] - 16:24
**prey** [2] - 34:8, 34:12
**prices** [1] - 29:18
**priority** [1] - 38:18
**private** [1] - 14:22
**privilege** [1] - 5:1
**privileged** [3] - 4:9, 4:11, 4:14
**pro** [1] - 37:24
**probability** [1] - 30:12
**probable** [1] - 30:13
**problem** [1] - 25:3
**proceed** [1] - 3:4
**proceedings** [1] - 52:5
**proceeds** [1] - 8:8
**process** [4] - 11:11, 20:10, 41:22, 48:21
**processor** [13] - 39:22, 39:23, 40:3, 45:7, 45:10, 45:12, 45:13, 46:12, 46:14, 46:20, 48:3, 48:4, 48:5
**processor's** [2] - 40:1, 40:3
**producers** [2] - 7:7,

7:13
**program** [18] - 19:9, 19:13, 20:9, 20:23, 22:6, 23:8, 25:14, 27:19, 28:10, 36:6, 37:8, 37:21, 37:23, 38:11, 38:22, 38:25, 45:25, 47:9
**Program** [6] - 29:16, 33:19, 36:2, 36:3, 38:18
**programs** [1] - 6:15
**prohibited** [2] - 17:15, 38:24
**prohibits** [1] - 47:13
**project** [1] - 41:9
**promulgated** [1] - 12:3
**prong** [1] - 38:1
**properly** [1] - 13:6
**prospect** [2] - 24:18, 30:6, 37:11
**protecting** [1] - 15:23
**protection** [2] - 13:19, 14:5
**protections** [1] - 44:18
**prove** [1] - 50:11
**provide** [4] - 16:22, 19:13, 22:10, 42:15
**providers** [2] - 8:7, 9:20
**provides** [2] - 10:15, 45:13
**providing** [1] - 14:24
**proving** [1] - 25:7
**public** [13] - 6:20, 6:22, 11:6, 22:22, 24:13, 25:17, 25:20, 25:23, 26:6, 38:10, 42:18, 42:19, 42:21
**Public** [3] - 44:11, 44:20, 53:4
**publicly** [1] - 8:9
**published** [1] - 7:6
**pull** [1] - 32:24
**purchaser** [1] - 45:1
**purpose** [2] - 19:3, 40:14
**put** [7] - 4:14, 9:24, 13:19, 30:10, 40:25, 45:21, 47:8
**putting** [1] - 46:11

**Q**

**quantity** [1] - 30:18
**questions** [1] - 43:3

**Quicken** [1] - 45:22
**quid** [1] - 37:24
**Quik** [1] - 32:22
**quite** [8] - 18:5, 22:4, 22:8, 22:25, 30:21, 33:10, 34:10, 38:18
**quo** [1] - 37:24
**quote** [2] - 4:6, 33:7
**quoted** [1] - 44:23

**R**

**raise** [1] - 14:3
**range** [1] - 35:4
**rates** [1] - 44:16
**rather** [6] - 9:9, 9:13, 14:21, 24:24, 40:10, 47:19
**rational** [1] - 24:22
**reach** [2] - 10:13, 32:1
**read** [4] - 9:2, 9:19, 10:8, 18:16
**reads** [1] - 18:16
**ready** [2] - 3:3, 3:5
**real** [1] - 24:12
**realize** [1] - 40:18
**really** [18] - 26:11, 26:13, 27:16, 29:6, 30:23, 31:15, 33:23, 34:16, 34:18, 34:24, 35:8, 37:1, 37:5, 37:23, 39:13, 41:1, 42:7
**Realtime** [1] - 53:4
**reason** [7] - 14:3, 20:4, 24:23, 26:7, 37:9, 37:12, 39:11
**reasonably** [1] - 3:22
**reasons** [1] - 24:13
**rebut** [1] - 35:2
**rebuttal** [1] - 43:7
**recast** [1] - 48:20
**receipt** [2] - 45:16, 45:25
**receipts** [1] - 45:16
**receive** [1] - 6:13
**received** [8] - 3:18, 7:8, 7:16, 9:4, 9:5, 9:21, 48:3, 48:6
**receiving** [1] - 14:23
**recent** [1] - 6:23
**recently** [1] - 13:5
**recesses** [1] - 48:14
**recipient** [2] - 20:16, 42:2
**recipients** [3] - 18:4, 29:19, 38:17
**recoil** [1] - 24:24

**recollection** [1] - 18:2
**record** [15] - 4:1, 4:2, 14:13, 46:2, 46:5, 46:6, 46:17, 46:20, 46:25, 47:19, 48:15, 48:25, 49:1
**recording** [1] - 45:9
**records** [5] - 3:20, 46:22, 47:2, 47:3, 48:16
**redemption** [7] - 3:20, 11:20, 13:17, 40:8, 41:18, 47:25, 49:14
**redemptions** [4] - 9:11, 13:22, 13:23, 14:2
**refer** [3] - 5:3, 8:1, 8:2
**reference** [1] - 6:3
**referencing** [1] - 21:23
**referring** [1] - 11:19
**reflect** [1] - 31:19
**reflection** [1] - 29:4
**reformulations** [1] - 44:17
**regard** [2] - 13:9, 13:10
**regarding** [1] - 43:8
**Registered** [1] - 53:4
**regroup** [1] - 34:17
**regulation** [1] - 31:12
**regulations** [2] - 12:3, 12:13
**relative** [3] - 35:20, 53:7, 53:8
**release** [9] - 4:2, 4:5, 5:10, 5:14, 9:23, 10:5, 11:17, 12:2, 31:24
**released** [2] - 12:5, 22:2
**relief** [1] - 8:23
**rely** [1] - 50:22
**remember** [3] - 23:19, 36:20, 38:24
**remind** [1] - 14:18
**removed** [1] - 7:1
**reply** [1] - 51:21
**report** [1] - 44:2
**REPORTER** [2] - 2:15, 53:1
**Reporter** [4] - 53:4, 53:4, 53:14
**reports** [1] - 33:25
**Request** [1] - 47:24
**requested** [7] - 3:11, 3:21, 7:20, 7:24,

19:18, 37:22, 47:22
**requester** [1] - 19:1
**requesting** [1] - 40:7
**required** [1] - 10:14
**Research** [2] - 44:12, 44:20
**research** [1] - 17:12
**reserve** [1] - 51:12
**resolved** [1] - 11:4
**respond** [3] - 51:11, 51:13, 51:21
**responded** [1] - 5:19
**responding** [1] - 24:11
**response** [2] - 14:15, 25:1
**rest** [2] - 19:8, 28:14
**resuscitate** [1] - 43:19
**retailer** [12] - 6:6, 6:13, 13:17, 15:14, 20:22, 38:25, 40:5, 40:20, 45:6, 45:12, 46:5, 46:8
**retailers** [15] - 3:23, 5:25, 6:10, 7:23, 15:9, 19:12, 19:25, 20:1, 25:13, 25:15, 25:21, 32:2, 38:23, 48:6, 48:17
**reveal** [2] - 4:6, 9:11
**reversed** [1] - 8:13
**reverting** [2] - 46:7, 46:10
**rewritten** [1] - 12:23
**RFI** [4] - 24:11, 25:1, 31:8, 31:9
**RFID** [1] - 17:3
**RMR** [2] - 2:16, 53:13
**road** [1] - 34:1
**Room** [1] - 2:7
**roughly** [1] - 33:18
**ruling** [2] - 8:12, 49:7

**S**

**S.W** [1] - 2:7
**sails** [1] - 24:7
**salaries** [1] - 42:21
**salary** [1] - 42:18
**sales** [8] - 4:7, 5:6, 32:16, 32:17, 34:7, 34:18, 35:13, 36:24
**Sam** [1] - 20:15
**satellite** [1] - 7:1
**saw** [1] - 33:3
**scenario** [1] - 49:20
**Schreier** [1] - 1:18
**screwed** [1] - 34:15

**SD** [6] - 1:14, 1:19, 1:23, 2:4, 2:17, 53:15

**seated** [1] - 43:11

**second** [4] - 3:18, 44:16, 45:20, 45:25

**secret** [3] - 22:13, 22:18, 41:20

**see** [7] - 4:11, 5:14, 16:7, 24:10, 27:4, 43:25, 49:7

**segment** [1] - 36:24

**sends** [1] - 42:1

**sense** [6] - 18:1, 33:10, 37:16, 49:24, 50:8, 50:10

**sensitive** [1] - 49:4

**serious** [1] - 49:10

**seriously** [1] - 39:12

**service** [1] - 42:16

**set** [3] - 8:4, 37:16, 53:10

**shapes** [1] - 13:24

**shares** [2] - 4:7, 5:5

**shockingly** [1] - 35:12

**short** [2] - 37:3, 44:5

**shorthand** [1] - 19:11

**shows** [1] - 46:13

**sick** [1] - 27:14

**side** [3] - 20:10, 41:6, 50:20

**sign** [2] - 45:18, 45:20

**signed** [2] - 25:13, 25:16

**significant** [4] - 11:7, 17:19, 28:23, 30:8

**significantly** [3] - 15:6, 30:18, 34:22

**silent** [3] - 10:12, 11:6, 33:8

**similar** [2] - 14:9, 41:14

**similarly** [1] - 5:15

**simple** [1] - 21:4

**simplified** [1] - 3:19

**simply** [2] - 29:15, 30:5

**singular** [2] - 23:13, 45:7

**Sioux** [6] - 1:14, 1:19, 1:23, 2:4, 2:17, 53:15

**sit** [1] - 24:8

**situated** [1] - 5:15

**situation** [2] - 9:10, 19:10

**six** [2] - 23:14, 50:11

**slate** [2] - 11:13,

16:18

**small** [2] - 36:14, 36:23

**SNAP** [32] - 3:20, 11:19, 13:17, 13:22, 14:9, 14:25, 19:12, 20:16, 21:7, 26:21, 29:16, 29:19, 32:16, 33:19, 34:7, 34:18, 35:4, 35:6, 35:11, 35:24, 36:1, 36:2, 36:3, 36:11, 38:17, 39:10, 40:20, 47:6, 48:17, 49:14

**soliciting** [1] - 10:22

**sometimes** [1] - 47:6

**somewhat** [3] - 31:2, 31:18

**soon** [1] - 52:3

**sorry** [5] - 11:25, 14:18, 26:11, 43:9, 46:7

**sort** [9] - 10:5, 12:18, 12:21, 15:8, 16:4, 27:8, 28:19, 43:16, 43:18

**sorted** [1] - 8:17

**sorts** [1] - 14:1

**sought** [2] - 13:21, 44:6

**source** [2] - 44:3, 44:17

**South** [3] - 6:18, 7:8, 23:2

**SOUTH** [2] - 1:2, 53:1

**SOUTHERN** [2] - 1:3, 53:2

**speaking** [3] - 23:24, 23:25, 32:10

**speaks** [1] - 45:9

**specific** [2] - 11:2, 28:13

**specifically** [1] - 23:3

**specificity** [1] - 10:16

**spending** [1] - 45:8

**SS** [1] - 53:1

**St** [1] - 38:14

**stakeholders** [2] - 11:14, 16:19

**stale** [1] - 50:12

**standard** [11] - 3:12, 11:3, 11:5, 16:25, 17:4, 26:15, 28:7, 28:24, 29:20, 30:19, 32:1

**stare** [1] - 37:13

**STARS** [2] - 46:1,

47:25

**start** [2] - 12:9, 36:19

**state** [3] - 8:18, 10:16, 47:9

**statement** [1] - 5:21

**STATEMENTS** [2] - 1:8, 1:16

**States** [4] - 3:8, 42:16, 53:3, 53:14

**STATES** [3] - 1:1, 1:9, 53:1

**states** [1] - 32:25

**statute** [8] - 11:25, 12:1, 12:17, 12:19, 12:23, 16:5, 23:4

**statutes** [1] - 12:13

**stay** [3] - 32:24, 43:10, 43:13

**step** [2] - 22:8, 39:15

**Stephanie** [2] - 2:2, 27:13

**stick** [1] - 34:19

**still** [4] - 38:9, 38:17, 45:11, 49:12

**stipulated** [1] - 3:17

**store** [7] - 20:16, 32:10, 32:15, 35:13, 40:9, 41:25, 42:1

**store's** [2] - 36:24, 46:6

**stores** [7] - 14:25, 32:15, 35:6, 36:6, 36:9, 36:11, 36:17

**straight** [1] - 30:9

**strategy** [1] - 32:24

**stray** [1] - 50:1

**stretching** [1] - 25:1

**strikes** [1] - 36:14

**strongly** [1] - 25:6

**stuff** [2] - 31:14, 36:4

**submission** [2] - 30:10, 37:10

**submissions** [2] - 49:19, 50:22

**submit** [1] - 41:11

**submitted** [2] - 6:7, 6:13

**submitter** [1] - 4:5

**subsidies** [5] - 7:9, 7:10, 7:15, 7:17

**substantial** [19] - 4:3, 4:4, 4:13, 4:15, 5:4, 25:8, 26:16, 28:22, 29:21, 29:24, 30:7, 30:17, 31:5, 34:15, 34:21, 38:6, 38:8, 39:14, 41:12

**successful** [3] - 22:20, 34:14, 36:7

**suffer** [2] - 26:8, 39:4

**sufficiently** [3] - 8:1, 10:19, 12:14

**suggest** [1] - 49:19

**suggested** [1] - 35:24

**suggesting** [5] - 25:7, 27:1, 32:12, 34:6, 42:10

**suggestion** [1] - 27:8

**suggests** [1] - 50:10

**Suite** [1] - 1:23

**suits** [1] - 43:13

**summary** [1] - 50:23

**supplement** [1] - 50:21

**supplied** [1] - 44:17

**supplying** [1] - 26:16

**support** [3] - 10:19, 10:25, 44:19

**supported** [1] - 9:23

**supposed** [1] - 37:3

**supposedly** [1] - 21:20

**surprised** [1] - 35:8

**surrounds** [1] - 6:9

**survive** [1] - 39:3

**SW** [1] - 2:10

**system** [5] - 27:17, 42:14, 44:5, 44:6, 44:7

**System** [2] - 46:2, 48:1

## T

**tangential** [1] - 35:23

**target** [1] - 34:4

**targeted** [1] - 33:11

**targeting** [1] - 34:4

**task** [2] - 10:21, 10:25

**taxpayer** [2] - 20:8, 24:14

**tend** [1] - 28:17

**terms** [2] - 7:20, 13:17

**test** [3] - 38:2, 38:4, 38:5

**testimony** [5] - 3:13, 17:2, 33:7, 33:14, 39:24

**TESTIMONY** [1] - 53:10

**THE** [65] - 3:3, 4:8, 4:17, 4:24, 5:2, 5:7, 6:14, 6:20, 7:5, 7:11, 8:6, 9:1, 9:18, 10:10, 11:16, 11:21, 12:25, 13:7, 14:7, 14:12,

14:17, 14:20, 15:16, 15:21, 16:2, 16:7, 16:12, 16:16, 17:7, 18:1, 18:10, 19:17, 21:22, 21:25, 22:19, 25:9, 25:12, 25:19, 36:10, 39:17, 40:23, 41:8, 42:18, 42:22, 43:4, 43:6, 43:12, 43:23, 46:3, 46:10, 46:16, 46:21, 46:23, 47:16, 48:9, 49:23, 50:3, 50:7, 50:20, 51:6, 51:10, 51:14, 51:17, 51:20, 52:2

**themselves** [2] - 19:16, 44:25

**they've** [2] - 33:4, 36:8

**thinking** [1] - 8:6

**third** [3] - 3:24, 21:18, 21:19

**thousands** [1] - 25:2

**three** [4] - 3:15, 4:6, 10:24, 39:7

**throughout** [4] - 13:24, 30:1, 30:20, 48:16

**throw** [1] - 45:23

**thumbs** [1] - 24:9

**TODAY** [1] - 9:2

**today** [4] - 12:23, 13:8, 17:2, 51:23

**together** [4] - 4:15, 6:11, 15:17, 15:18

**tomorrow** [1] - 33:3

**took** [1] - 42:2

**top** [7] - 7:7, 9:3, 10:7, 18:3, 24:3, 33:24

**topic** [1] - 8:12

**total** [2] - 35:13, 47:8

**totally** [1] - 34:15

**touch** [1] - 18:19

**touched** [1] - 3:9

**towards** [4] - 6:4, 13:20, 45:8, 45:9

**track** [1] - 48:17

**trade** [4] - 15:7, 15:10, 23:19, 23:22

**trafficking** [1] - 33:24

**transaction** [4] - 41:6, 45:7, 45:19, 47:18

**transcript** [2] - 53:5, 53:5

**TRANSCRIPT** [1] - 1:16

**transferred** [3] -

39:25, 40:4, 40:10

**transmission** [1] - 42:12

**transparency** [2] - 18:20, 24:13

**Treasury** [1] - 46:19

**trends** [2] - 4:7, 5:6

**trial** [1] - 3:10

**TRIAL** [1] - 1:16

**tried** [1] - 36:20

**true** [3] - 18:10, 30:12, 53:5

**truth** [1] - 35:2

**try** [2] - 26:1, 36:3

**trying** [11] - 4:17, 14:22, 15:17, 16:7, 19:7, 21:2, 21:25, 40:23, 43:18, 47:14, 47:17

**twice** [1] - 39:7

**twiddle** [1] - 24:8

**two** [5] - 3:9, 3:14, 31:11, 45:16, 50:16

**type** [3] - 7:1, 11:18, 15:2

**typically** [1] - 22:16

## U

**U.S** [6] - 1:13, 1:18, 2:3, 2:6, 2:10, 2:16

**U.S.C** [1] - 11:25

**uncertain** [1] - 31:19

**Uncle** [1] - 20:15

**under** [18] - 3:12, 6:23, 9:7, 11:25, 12:1, 13:3, 13:6, 13:11, 15:20, 15:21, 17:5, 26:15, 27:9, 37:25, 41:14, 42:14, 46:24, 47:13

**underestimate** [1] - 18:14

**underneath** [1] - 39:21

**understood** [2] - 14:4, 41:6

**unfortunate** [1] - 26:5

**UNITED** [3] - 1:1, 1:9, 53:1

**United** [4] - 3:8, 42:16, 53:3, 53:14

**unless** [2] - 31:15, 37:12

**unreported** [1] - 44:11

**up** [16] - 8:21, 14:16, 17:24, 24:25, 25:4,

25:13, 25:16, 26:2, 27:12, 34:16, 35:6, 36:21, 38:14, 39:23, 49:4, 51:22

**USA** [1] - 9:2

**USDA** [15] - 3:20, 10:23, 10:25, 11:3, 11:5, 11:9, 11:16, 14:6, 16:22, 17:3, 17:4, 22:11, 31:22, 47:3, 48:5

**USDA's** [1] - 40:15

**uses** [1] - 17:1

## V

**value** [5] - 18:14, 49:11, 49:13, 49:15, 50:4

**vendor** [2] - 40:5, 45:19

**versed** [2] - 9:16, 38:15

**version** [1] - 19:11

**view** [3] - 24:19, 38:3, 40:15

**viewed** [2] - 8:22, 8:23

**Volpe** [1] - 30:25

**volume** [4] - 34:7, 35:4, 36:1, 47:8

**voluntarily** [3] - 19:12, 20:8, 37:21

**voluntary** [2] - 23:8, 37:7

**vs** [1] - 1:8

## W

**walk** [1] - 41:24

**walks** [1] - 20:15

**Walmart** [6] - 15:12, 23:21, 23:25, 24:2, 24:5, 24:11

**wants** [2] - 18:21, 42:7

**Washington** [2] - 2:7, 2:11

**Watch** [1] - 44:21

**weak** [1] - 30:1

**Webster** [1] - 30:2

**Webster's** [1] - 30:13

**WHEREOF** [1] - 53:10

**Whoa** [1] - 34:16

**whole** [2] - 21:21, 26:4

**willing** [1] - 14:16

**wind** [1] - 24:7

**withheld** [3] - 4:2, 10:12, 13:6

**withhold** [2] - 11:1, 16:1

**withholding** [4] - 3:12, 11:9, 12:17, 17:5

**witness** [2] - 34:25, 39:20

**witnesses** [3] - 25:12, 39:7, 39:8

**WL** [1] - 44:9

**wondering** [1] - 14:20

**word** [1] - 50:25

**words** [1] - 30:5

**works** [1] - 44:6

**world** [4] - 23:13, 23:14, 24:19, 28:14

**worried** [1] - 30:22

**worry** [2] - 29:8, 29:9

**worst** [1] - 49:20

**worth** [1] - 9:6

**worthy** [1] - 19:15

**wrap** [1] - 38:16

**write** [1] - 50:25

**written** [1] - 50:21

**wrote** [1] - 23:23

## Y

**year** [1] - 3:25

**yearly** [1] - 40:8

**years** [5] - 9:3, 12:16, 17:12, 17:13, 50:11

**yesterday** [1] - 17:2

**young** [1] - 18:12

**Yuan** [1] - 2:9

## Z

**zero** [1] - 35:5

**zip** [1] - 47:9