UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

---

A<small>RGUS</small> L<small>EADER</small> M<small>EDIA</small>, <small>DBA</small> *A<small>RGUS</small>  <small>LEADER</small>*,

        Plaintiff,

      *v.*

U<small>NITED</small> S<small>TATES</small> D<small>EPARTMENT</small> <small>OF</small> A<small>GRICULTURE</small>

        Defendant.

Case No.:  11-4121

**PLAINTIFF'S POST-TRIAL ANSWERING BRIEF**

---

  Plaintiff, Argus, through its attorney, Jon E. Arneson, submits this brief in answer to the brief filed by Defendant, USDA. (Docket  #121)

## Legal Standard

  FOIA's essential purpose and application are indisputable and were summarized in *Dept. of State v. Ray,* 502 U.S. 164, 173 (1991):

> The Freedom of Information Act was enacted to facilitate public access to Government documents. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). The statute was designed "`to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Consistently with this purpose, as well as the plain language of the Act, the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents. Ibid; *Department of Justice v. Reporters Committee*, 489 U.S 749, at 755 .

  Reiterating these FOIA fundamentals, the 8th Circuit has emphasized:

- FOIA is intended "to permit access to official information long shielded unnecessarily from public view." *Hulstein v. DEA*, 671 F.3rd 690 (8th Cir. 2012) (quoting *Milner v. Department of Navy*, 562 U.S. 562 (2011).

1

- "FOIA generally mandates broad disclosure of government records." *Central Platte Nat. Res. Dist. v. USDA,* 643 F.3d 1142, 1146 (8th Cir. 2011) (citations omitted.).

- FOIA exemptions "are to be narrowly construed to ensure that disclosure, rather than secrecy, remains the primary objective of the Act." *Missouri Coal. for the Env't Found v. U.S. Army Corps of Eng'rs,* 542 F.3d 1204, 1208 (8th Cir. 2008).

These judicial holdings are not platitudes to which federal agencies need only pay lip service. They substantiate a long-held view that the public's right to know and governmental accountability play crucial roles in our democracy. Thomas Jefferson wrote:

> The good sense of the people will always be found to be the best army….The people are the only censors of their governors; and even their errors will tend to keep these to the true principles of their institution….The way to prevent these irregular interpositions of the people is to give them full information of their affairs through the channel of the public papers, and to contrive that those papers should penetrate the whole mass of the people. The basis for government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter….Cherish, therefore, the spirit of our people, and keep alive their attention….[and]
>
> If a nation expects to be ignorant and free in a state of civilization, it expects what never was and never will be. The functionaries of every government have propensities to command at will the liberty and property o their constituents. There is no safe deposit for these but with the people themselves, nor can they be safe with them without information. Where the press is free and every man able to read, all is safe.

THE POLITICAL WRITING OF THOMAS JEFFERSON, 93, Edited by E. Dumbauld (1955).[1]

---

[1] James Madison agreed that knowledge was crucial and warned of the consequences of ignorance:

> A Popular Government, without popular information or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both. Knowledge will forever govern ignorance; and the people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

9 Writings of James Madison 103 (To W.T. Barry, Aug. 4, 1822) (G. Hunt ed. 1910).

## Introduction

Argus's Freedom of Information Act (FOIA) request is for USDA's record of the annual amounts the federal government pays out to retailers voluntarily participating in USDA's Supplemental Nutrition Assistance Program (SNAP). USDA has conceded that the SNAP payment information is part of government records "maintained within [USDA's] information technology system."[2] [Docket 60, ¶¶'s 7-9; Gold testimony, p. 31 ll. 13-16]. USDA's refusal to disclose the information is now predicated exclusively on 5 U.S.C. §552(b)(4))—FOIA Exemption 4—which protects information proven to be "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."

At the conclusion of closing arguments at trial on May 25, 2016, USDA, which has the burden of proving all the essential elements of the defense, asked the Court for the opportunity to file a post-trial brief on the "obtained from a person" element. Argus acquiesced, but not as a concession that an exemption 4 assessment is even warranted.

In the final analysis, this is not an exemption 4 case. The SNAP payment information sought by the Argus differs substantially from the nature of the information involved in the exemption 4 case law. In deciding whether financial information is—or is not—"obtained from a person" under exemption 4, federal courts have not been dealing with a government agency's concealment of amounts of government payments under a government program to businesses

---

[2] It would be pointless to pretend otherwise. Certainly, USDA, as the federal agency running SNAP, keeps track of where the program's money is spent. The SNAP EBT system gives USDA the capability to monitor and maintain SNAP household account records, from which it could produce the payment information requested.

voluntarily participating in that program.[3]

USDA has carefully sidestepped this proverbial "elephant in the room," but that does not make the elephant disappear. FOIA's general purpose is to validate the public interest in knowing what the government is doing, and the FOIA request in this case is certainly in keeping with that purpose. Common sense confirms that SNAP payment information is not subject matter that should even activate exemption 4 concern.

### *Argus v. USDA* not an Exemption 4 case

Whether described as SNAP payment information or SNAP sales information, the information requested by the Argus originates and remains—at all times—within the closed circuit of a government program. That requested agency information is basically an accounting from government of its spending. And there has never been any question that USDA does indeed track the flow of its program money in the administration and operation of SNAP.

No matter how USDA chooses to characterize Argus's record request[4], the SNAP payment—or sales—information has no prior, independent existence as private sector business information. Were it not for the retailers' participation in SNAP, neither the retailers nor USDA would have this information—or any need for it. SNAP payments are the record of the retailer's business with government. As such, it is essentially a public business record.

---

[3] The deconstruction of the "obtained from a person" requirement, even if preempted, serves to accentuate the fallacy of USDA's presumption that it has the prerogative to withhold government spending records under FOIA exemption 4.

[4] USDA's persists in using the term "redemption," which tends to cloud the issue. While the misnomer is discussed more fully the next section, it is worth noting at this point that USDA knows precisely what the Argus is asking for in this case. (Pierce T.Tr. 15:20-16:22)

Then, too, the SNAP payment information is not information being "obtained from (or about) a person" who is currently *outside* government as a condition of his/her conducting business *inside* government. To repeat, it is, more accurately, the record of doing that government business.

That the amounts and distribution of the government's payments relate to the involvement of the private sector does not change the complexion of the case.  The request still pertains to information about the government.

The legislative history, which USDA cites, is hardly dispositive:

> [Exemption 4] would assure the confidentiality of information obtained by the Government through questionnaires or through material submitted and disclosure made in procedures such as the mediation of labor-management controversies.  It exempts such material if it would not customarily be made public by the person from whom it was obtained by the Government.  The exemption would include business sales statistics, inventories, customer lists, scientific or manufacturing processes or developments, and negotiation positions or requirements in the case of labor-management mediations.

H.R. Rep. No. 1497, 89th Cong. 2d Sess., 10 (1966).

This passage is easily read to stop considerably short of allowing government to conceal its record of a private business's gross annual earnings in a government program.  Whatever the value of this particular legislative history[5], it depicts a much narrower exemption 4 role than that which USDA tries to press upon the Court.  It is doubtful anyone would take seriously any legislative history that read:  "Exemption 4 would assure the confidentiality of amounts Government pays out to those voluntarily doing business with the Government."

---

[5] The House Report is not exactly legislative gospel either, as the Supreme Court noted in *U.S. Dep't of the Air Force v. Rose*, 425 U.S. 352, 366 (1976).  The clear message in *Rose,* FOIA's principal purpose requires courts "to choose that interpretation most favoring disclosure." (quoting *Vaughn v. Rosen,* 523 F.2d 1136. at 1142 (D.C.Cir. 1975).

In that regard, USDA would do well to read that legislative history in light of the underlying rationale for FOIA's special safeguards for certain information. The reference to "business sales statistics," for instance, is not without context. *E.g. Judicial Watch, Inc. v. Export-Import Bank,* 108 F.Supp.2d 19, 29 (D.D.C. 2000) (The purpose of Exemption 4 is to protect private business information that "the government requires a private party to submit…as a condition of doing business with the government.")

As a practical matter, it is eminently reasonable that a private business choosing to engage for profit in a public government program should expect to sacrifice an element of its commercial "privacy." *Racal-Milgo Gov't Sys. v.* SBA, 559 F.Supp. 4, 6 (D.D.C. 1981) ("Disclosure of prices charge the Government is the cost of doing business with the Government.") *EHE.*, No. 81-1087, slip op. at 4 (D.D.C. Feb. 24, 1984) ("[O]ne who would do business with the government must expect that more [information] is more likely to become known to others than in the case of a purely private agreement.")

It should be remembered, too, that there is nothing singular about any particular retailer's SNAP payment information. This is not a question of some isolated disclosure. There is nothing inherently unfair or compromising in the universal disclosure of information of all program participants. In that respect, it is quite unlike the usual exemption 4 cases in which one business or a handful of businesses are potentially disadvantaged by release of information not required of their competitors.

USDA's case is rooted in semantic sophistry. But all the semantics in the world cannot cram a square peg into a round hole. This is a case about government spending. And government spending is plainly not what exemption 4 was designed to protect.

Considering that neither Argus nor USDA—with the assistance of the DOJ—has uncovered an analogous exemption 4 case, in a very critical respect this may well be a case of

first impression. After five years with this case, this Court is perfectly positioned and certainly intellectually equipped to draw a logical legal line through exemption 4 and hold that FOIA does not provide an exemption for amounts government has paid a business for service or product voluntarily provided under a government program like SNAP.

### FOIA Exemption 4: "Obtained from a person"

If, in fact, *Argus v. USDA,* is susceptible of exemption 4 scrutiny, the "obtained from a person" requirement still presents a considerable obstacle for the agency.

USDA's consistent use of the term "redemption," which dates back to the food stamp era, and its preoccupation with the EBT process tend to complicate what should be a relatively simple exercise.

With respect to "redemption," it is strange that USDA's lexicon hasn't kept up with the EBT technology. Since USDA runs SNAP, its established terminology is more or less forced on others communicating about SNAP. An unfortunate result of this particular misnomer is that it tends to misdirect attention.

By this point it is clear that Argus wants to know the government's SNAP payment amounts. USDA knows that, as do the federal courts.[6] (Gold T.Tr. 47:23-48-25) However, for a long time USDA loosely referred to the retailers' "redemptions,"[7] suggesting that Argus was

---

[6] The 8th Circuit and this Court also understand that the Argus has asked that government provide the amounts government has paid to SNAP retailers. They are not directly targeting confidential business information from the retailers. *Argus Leader Media v. USDA*, 740 F.3rd 1172 (8th Cir. 2014) ("*Argus Leader* (Argus) wondered how much money individual retailers received from taxpayers each year through the program."); Argus Leader Media v. U.S. Dept. of Agric., No. 11-04121, 2015 WL 5773631 (D.S.D. Sept. 30, 2015) ("Argus Leader only seeks information about the yearly redemption amounts paid to each participating store.")

[7] See, for example, FNS's RFI published in the Federal Register.

somehow trying to invade the retailers' private affairs.[8]

USDA's insistence that the requested payment information is actually "redemption" information "obtained from a person" outside the government obscures the point that even if SNAP payments and sales are equal—as they should be—Argus is asking for government's spending information and not the retailers' sales information.

As for USDA's determined effort to insinuate the EBT system into the discussion, it is noteworthy that the EBT process is nothing more than SNAP mechanics. EBT adds nothing of substance to a FOIA exemption decision. EBT provides the technological means of making the use and payment of government benefits/funds faster and more efficient. The circuitous route by which government obtains an accounting of the flow of its own SNAP money is inconsequential. The EBT process affects neither the integral character of the information requested nor the rational expectation that such information is open under FOIA.

Stripping away the modern technology reveals the essential simplicity of a government assistance program, which SNAP is. At its core, SNAP is a program under which the federal government pays for the food of low-income households, diagrammed as follows:



⇧ = Food (Benefits)
⬇ = Money (Payment)

---

[8] At least now USDA acknowledges that whatever might be called a "redemption" is actually a redemption of benefits by the SNAP household. (Shelly Pierce, T.Tr. 49:21-50:13) The SNAP retailer takes no action that approximates a type of "redemption."

In actual SNAP practice, of course, the federal government is distributing money/credit to the SNAP households to buy food directly from participating SNAP retailers:

*Taxpayer* ➔➔➔ *Federal Government* ➔➔➔ *SNAP Households*
⬇ ⇧
⬇ ⇧
⬇ ⇧
*SNAP Retail Grocers*

⇧ = *Food (Benefits)*
⬇ = *Money (Payment)*

But in theory, the federal government would accomplish the same thing if it bought the food directly from retailers[9] and then distributed the food to the SNAP households:



*SNAP Households*
⇧
⇧
⇧
*Taxpayer* ➔➔➔ *Federal Government*
⬇ ⇧
⬇ ⇧
⬇ ⇧
*SNAP Retailers*

⇧ = *Food (Benefits)*
⬇ = *Money (Payment)*

The fact of the matter is that all roads lead to Rome. The money that is paid out by government, *i.e.* the record of which is the subject of the FOIA request, comes from government in the first instance. USDA's flowchart does not change that. It merely shows the process that has been implemented to make the transfer of money from government more efficient.

---

[9] The $64,000 question is whether USDA would handle all of this differently if the retailers were paid directly by the government. At a minimum, it indicates the absurdity of trying to make overly fine distinctions—over the source of information in this case—to protect information that needs no protection.

Since the SNAP household's use of the EBT card initiates the transaction, one might wonder why USDA does not consider the requested information to originate with the SNAP client and *not* the SNAP retailer.  With a slight modification, the Argus inquiry could be about SNAP household's spending (EBT) information, *i.e.* "Where did you spend your benefits?"

Frankly, the claimed source of the information in the EBT process is a distinction without a difference.  And, to be perfectly blunt, as far as the Argus is concerned, it is inconsequential how the federal government derives its payment information.

Another important consideration is that SNAP is a self-contained transactional process within the federal government's orbit.  Government's SNAP administrator, FNS, together with SNAP households[10] and SNAP retailers share that space—a space that also accommodates EBT processors and, ultimately, the U.S. Treasury. (Gold T.Tr. 48:18-22).  Everything that happens from the beginning to the end happens within SNAP, itself.

- The federal government distributes benefits—now electronic purchasing power—to eligible SNAP households;
- The SNAP household uses that "money" to buy food from participating SNAP retailers;
- The federal government pays the SNAP retailers by transferring the amount of the benefits used from the account of the SNAP household to the account of a SNAP retailer.

It amounts to a reassignment or redistribution of taxpayer dollars from the original recipient, the SNAP household, to the ultimate recipient, the SNAP retailer.  What begins as government spending stays that way throughout the process.  In actuality, when the SNAP household buys food with its government benefits, it is the government's purchase.  Therefore,

---

[10] USDA refers the SNAP households as "clients."

characterizing the flow of that spending information as from government to government is more than theoretical. That government can be consider to be receiving information from itself and about itself is not an unreasonable supposition.

In *Board of Trade of City of Chicago v. Commodity Futures Trading Commission,* 627 F.2d 392, 404 (D.C. Cir. 1980), cited by USDA, the Court held that exemption 4 does not protect information "generated within Government." Although "generated" means more than recasting information submitted by private sector, it can reasonably be concluded that in this self-contained program (SNAP), the information never loses its identity as a government-related transmission.[11]

The SNAP information being requested by Argus is a record of actual government "business" being done. It is not pre-existing information about a person being submitted to qualify to do government business.

Finally, "[o]btained from a person" is "information obtained outside of government." *Fed. Open Market Comm. Of Fed. Reserve System v. Merrill*, 442 U.S. 340, 360 (1979). Here the information is all contained within a government program. The information would not exist, but for the retailer's participation in the program. It has no independent vitality. (Gold T.Tr. 63:14-20)

---

[11] USDA also cites *Board of Trade*, *supra,* for the proposition that exemption 4 is "sufficiently broad to encompass financial and commercial information [provided by a person] concerning a third party." This presumably covers the theory that the EBT processors are furnishing the retailers' sales information. The underlying premise, however, is that there is true ownership of this "commercial interest," by the third party, which in our case would be the SNAP retailers. It is certainly debatable whether the SNAP retailer can be said to have a unique ownership interest in the SNAP transactions. They have chosen to participate in the government's program and to accept the business of the SNAP household, in anticipation of being reimbursed by the government through the program.

**FOIA Exemption 4: "Confidential information"**

Argus, understandably, takes serious issue with USDA's perfunctory observation that it has successfully briefed and proven the requested information is "confidential," and with David Gaston's perfunctory assertion that he is an expert on the subject.[12] Mr. Gaston, in closing argument, stated:

> What I am an expert on is what the information requested by Argus does, in terms of the competitive nature of that information, in the complete absence of that information in the marketplace by those affected retailers of the information requested….I can say that a competitive harm element in this particular set of information in this particular matter is clear.

(Closing Statement, p. 7, ll. 19-24)

Lest USDA overestimate its performance in trying to carry its burden of proving that disclosure of the annual SNAP payments to retailers is likely to cause them "substantial competitive harm," in the final analysis, it did not succeed.

While it is unnecessary to belabor the evidentiary deficiencies, suffice it to say that the central theme of USDA's retailer-witnesses was that they disliked competition and wanted as much protection from it as possible. A substantial number of seemingly material stones were left unturned. For example, there was no evidence that the retailers were being unfairly singled out. There were only generalized claims that the putative competition would/could use SNAP data

---

[12] Mr. Gaston, an 11th hour addition to the defense's legal team may not have been aware that his client, through Ms. Andrea Gold, had made previous claims under oath that the very reason the agency was turning to the SNAP retailers with the RFI was because USDA supposedly lacked the expertise to determine whether it should continue to litigate the Exemption 4 defense. [Docket 54-1, ¶6 and Docket 78, ¶14] One thing that Mr. Gaston would *not* have known on May 25 is that Under Secretary Kevin Concannon, FNS's top official, in a June 27 article on Wall Street Journal, would go on record with contradictory position. Concannon said, "There was fear that somehow [disclosure of the payment amounts] would adversely affect the competitive situation of stores. I don't share that view myself." Although this might not be evidence in this case, it suggests what might be in store in the future.

effectively, without much of a consensus how. There was nothing to explain why retailers would be powerless to ward off completion. No one even cited SNAP business as being an incentive to starting, continuing, expanding their own business. There was no attempt to show whether potential competition would be more or less likely to locate in an area where an existing store's SNAP sales volume appears "unusually high" or, for that matter, "unusually low." On the whole, the "predictive facts" that needed to be established, really weren't.

On the other hand, it was evident that SNAP sales volume would not reveal a store's total sales, its profitability, its cost of doing business, its customer demographics, its pricing, products, promotions. Retailers acknowledged that a number of factors would likely influence a store contemplating competitive marketing changes. It was implied SNAP demand would be *a* factor, but there was nothing to indicate particular significance or value would attach.

But perhaps the most compelling piece of evidence is that USDA individually contacted over 320,000 SNAP retailers, specifically asking those who opposed disclosure to "explain why disclosure is likely to cause substantial competitive harm…." There were fewer than 90 responding retailers who even mentioned competition as a concern.

Inexplicably, USDA was not affected much by this astoundingly small number of responses from disclosure opponents. Arguably, the prudent course would have been to abandon the exemption 4 defense and gracefully accept that SNAP transparency is not likely to destroy America's economy.[13]

---

[13] One of the major proponents of disclosure has been none other than Under Secretary Conccannon, who wrote in the press release accompanying the RFI, "Our goal is to provide more transparency so that people can have access to the basic information about the amount of SNAP benefits that individual grocery stores and retailers are redeeming." (Gold T.Tr. 71:24-73:20)

Of even greater significance, USDA did not present any template or useful definition of "substantial competitive harm" for the evaluation of its own evidence. It remains a mystery what USDA thinks that phrase means or how it would apply across the board to 320,000 SNAP retailers. Collectively, USDA's witnesses theorized that disclosure of the SNAP data was likely to cause some competition, but provided no qualitative or quantitative proof of "harmful competition," much less "*substantially* harmful competition." USDA simply did not leave the Court anything upon which to base a finding of "substantial competitive harm."

In the final analysis, the more USDA's retail witnesses complained about hypothetical competition, the more convincing the argument became that this is not an FOIA exemption 4 case at all. Congress explicitly depicted SNAP's (née Food Stamp Program) purpose and policy at 7 U.S.C. §2011:

> It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households. Congress finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods. To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.

There is no mention in 7 U.S.C. §2011—or, for that matter, anywhere—of any concern for the profit of SNAP retailers. Interestingly, the ten retailer-declarants who signed the affidavit template prepared the National Grocer's Association's counsel, emphasized their service to "SNAP recipients…in order to assist low income people in need of food and nutritional assistance."

Yet USDA now would let private sector business dictate the terms of disclosure of a government program in which it is only voluntary involved.  Even worse, USDA is capitulating to the competition theories of a handful of retailers to the detriment of SNAP.  Ironically, virtually all of USDA's retailers extolled the virtues of competition.  They just don't want any for themselves.

## Conclusion

After five years, the dust has finally settled.  What is left is Argus's valid FOIA request for information pertaining to government's SNAP spending.  It is implausible that Congress intended to allow government spending under a government program to be covered up primarily because private business wants it that way.  But that is precisely what USDA proposes in espousing FOIA exemption 4 and effectively handing the reins to a few retailers worried about their bottom lines.  Instead of catering to a handful of retailers, USDA should be catering to the SNAP households.  That is what is expected of USDA under the law.

USDA's decision to interpret a FOIA exemption liberally to avoid complying with FOIA's basic mandate is a baffling and indefensible decision.  From a legal *and* philosophical perspective FOIA exemption 4 is not a defense well-suited to this case.  And even if it were, USDA has not come close to carrying its heavy burden of proof to overcome FOIA's presumption of disclosure.

Argus urges the Court to uphold the FOIA request in this case on the basis of both law and common sense.

DATED this 20th day of July, 2016.

/s/ Jon E. Arneson
JON E. ARNESON, SD. Bar #45
123 South Main Avenue, Ste. 202
Sioux Falls, South Dakota 57104
Telephone:  (605) 335-0083
Attorney for Plaintiff